**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                                    )
NESTED BEAN, INC.,                                  )
                                                    )
        Plaintiff,                                  )        Civil Action No. _____
                                                    )
v.                                                  )
                                                    )
                                                    )
THE UNITED STATES OF AMERICA,                       )
                                                    )
        Defendant.                                  )
                                                    )
_____)

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT

### Introduction

1.      Plaintiff Nested Bean, Inc. brings this lawsuit against the United States of America seeking damages under the Federal Tort Claims Act (FTCA)[1] for devastating harm to Nested Bean caused by the actions of the Consumer Product Safety Commission (CPSC) and its former Commissioner, Richard Trumka, Jr., who knowingly or recklessly made false and misleading statements that weighted infant sleep products like Nested Bean's are dangerous and hazardous, and then caused major retailers to discontinue sales of Nested Bean's products by sending threatening letters to those retailers repeating the misrepresentations and false statements about weighted infant products like Nested Bean's. These actions have decimated Nested Bean's highly successful business.

2.      Nested Bean is a small, immigrant, minority, and woman-owned business. Manasi Gangan founded Nested Bean in 2011 in Hudson, Massachusetts, after experiencing the

---

[1] _See_ 28 U.S.C. § 1346(b)(1); 28 U.S.C. §§ 2671-2680; 15 U.S.C. § 2053(i).

1

challenge of being the working mother of a baby who could not fall asleep and stay asleep without being held, unless she placed her hand gently on her baby's chest. Millions of parents share Ms. Gangan's struggle, particularly those who must juggle the demands of caring for a newborn without the benefit of sufficient parental leave or help. These challenges often lead parents to engage in unsafe practices, like placing loose objects on or near their baby, co-sleeping with the baby, using sleep positioners, or other unsafe products.

3.      Ms. Gangan, an engineer who had over fifteen years of professional experience working with consumer-facing web products before founding Nested Bean, was determined to help discourage these unsafe practices and to provide safe and effective relief for other parents. So she set out to create a product that would safely and effectively provide the baby with the proven benefits of the sense of being comforted through touch, consistent with safe sleep guidance, such that the baby would be on its back, in the crib, without any loosely placed sleep aids.

4.      Nested Bean's innovative infant sleep products apply a lightly padded area on the upper torso of its wearable products, where caregivers usually place their reassuring palm, to extend the principles of parental simulated touch intervention, which is proven safe and effective in neonatal intensive care units (NICU) on the most vulnerable of low-birth-weight babies.

5.      Nested Bean's cautious designs have maintained safety at the forefront. In designing its first product, Nested Bean reviewed ten years of public incident data for surrounding conditions, consulted human factors design experts, and sent protypes for lab tests, making improvements with each iteration of product design. Nested Bean's design intentionally avoided application of the padded portions containing filling on areas that could potentially

hinder mobility or cause overheating, both being common contributors in historical safety incidents.

6.     Today, Nested Bean's product line includes swaddles, sleep sacks, and pajamas, all with a sewn-in, lightly padded center on the upper torso of each product. Each product comes in a variety of sizes appropriate for different ages, sizes, and developmental stages of the baby.

7.     Consistent with the company's ethos for honesty and transparency, Nested Bean coined the phrase and marketed its products as "weighted" infant sleep products—though Nested Bean's products are among the lightest weighted of any "weighted" infant sleep products, including all infant sleep products with additional filling (whether or not marketed as "weighted")

8.     Nested Bean is deeply committed to infant safety. It continues to invest in and undergo voluntary testing and scientific research. Nested Bean's safety record speaks for itself. It has sold over 2.5 million products without a single known incident or CPSC investigation report concluding that any of its products are hazardous.

9.     In fact, CPSC staff evaluated three of its products—considering in detail each product's design and construction—to test whether any of the products could rise over the baby's nose or mouth and present a risk of suffocation. This thorough evaluation concluded with a satisfactory closing report and a determination that no further action was necessary.

10.     Nested Bean was an extraordinarily successful company before Trumka and the CPSC eviscerated the company's business. Nested Bean had sold millions of products, and had experienced years of growing profits.

11.     That all changed after former CPSC Commissioner Trumka put Nested Bean in his crosshairs. Beginning in 2022 (long before Nested Bean was aware of it) and extending into

2024, Trumka went on a crusade to regulate weighted infant sleep products including Nested Bean's. And when the CPSC rejected his proposal to do so, he attempted (successfully) to enact an entirely illegal one-man ban that virtually destroyed Nested Bean's business.

12.    On November 8, 2023, the CPSC voted 3-1 against Trumka and his proposal to regulate or issue safety standards for weighted infant sleep products like Nested Bean's. The Commissioners voted against Trumka's proposal because (as multiple Commissioners pointed out) CPSC did not have data to support promulgating any standards for these products without significant research that had not yet been done. CPSC therefore did not even consider banning these products.

13.    Apparently frustrated by this vote, Trumka ignored it, ignored the lack of scientific data, ignored the law, and launched his own public relations campaign—using official CPSC letterhead and social media accounts—to knowingly or recklessly spread false and misleading statements about weighted infant sleep products including Nested Bean's with the goal of enacting an illegal and unilateral ban of the products.

14.    Trumka began posting attacks on weighted infant sleep products like Nested Bean's on his official CPSC social media accounts—attacks that were laden with knowing or reckless misrepresentations about the supposed risk of products like Nested Bean's, and misrepresentations about the absence of scientific data to support Trumka's false claims.

15.    Trumka then escalated matters by sending letters directly to Nested Bean's retailers, repeating Trumka's false and misleading claims that Nested Bean's products were somehow dangerous, and implicitly (but falsely and misleadingly) threatening them with investigations or regulatory consequences if they did not stop selling Nested Bean's products.

16.    Trumka's actions appear to have been born of frustration not only with the CPSC vote that soundly rejected his attempt to regulate weighted infant products, but also with his other clumsy attempts to raise his own profile.

17.    For instance, in January 2023 Trumka stated that gas stoves were a "hidden hazard" and "[p]roducts that can't be made safe can be banned."

18.    That statement was met with embarrassing backlash. Indeed, the White House that nominated Trumka to the CPSC put out a statement that President Biden "does not support banning gas stoves – and the Consumer Product Safety Commission, which is independent, is not banning gas stoves." CPSC's then Chair, Alexander Hoehn-Saric (who, like Trumka, was also nominated by President Biden), put out a statement that included the following: "[T]o be clear, I am not looking to ban gas stoves and the CPSC has no proceeding to do so."

19.    In an apparent effort to rehabilitate his public image, Trumka turned his aim from gas stoves to weighted infant products like Nested Bean's and fired away notwithstanding that his statements had no basis in fact, were not grounded in scientific data, and were highly likely to destroy Nested Bean's business.

20.    What is more, Trumka made these statements even though the CPSC: (1) had not (and has not) defined or created a category of "weighted" infant sleep products; (2) had not (and has not ) identified a hazard pattern associated with "weighted" infant sleep products; and (3) publicly admitted that it lacked sufficient data to begin the rulemaking process for a mandatory product safety standard. None of that mattered to Trumka.

21.    Trumka's unlawful conduct eviscerated Nested Bean's business. Nested Bean's retailers (including Target, Amazon, and others) almost immediately pulled Nested Bean's products from their shelves and stopped selling them. At least one retailer notified customers that

the CPSC had warned these products should not be considered safe for use. Customers became confused by Trumka's public misrepresentations, which gave the appearance of being official CPSC pronouncements, though they were not. Trumka created the false impression that Nested Bean's products had been pulled from retailers' shelves or even recalled due to some sort of government directive or requirement.

22.    As a result, Nested Bean's sales plunged to almost unsustainably low levels and destroyed the business that Ms. Gangan had fought for over a decade to build—a business that was highly successful and was poised for even more growth and expansion into new product lines and new markets. None of that happened due to Trumka and the CPSC.

23.    While Nested Bean may never recover completely from the harm that Trumka's and the CPSC's conduct caused to it, Nested Bean seeks through this lawsuit to obtain redress for the losses that Nested Bean has suffered and continues to suffer, and to correct the record that was created by Trumka's and the CPSC's false and misleading statements and misrepresentations about the safety of Nested Bean's products.[2]

## Parties

24.    Plaintiff Nested Bean, Inc. is a Delaware corporation with its principal place of business in Massachusetts.

25.    Defendant United States of America is the federal government of the United States of America. It is the proper defendant in this lawsuit under 28 U.S.C. §§ 1346(b)(1) and 2679(b)(1), and 15 U.S.C. § 2053(i).

---

[2] Nested Bean also filed a case seeking declaratory and injunctive relief for violation of the Administrative Procedure Act and related claims. Currently the defendants' motion to dismiss is pending. *See Nested Bean, Inc. v. Consumer Product Safety Commission, et al.*, No. 1:25-cv-00389-RGA (D. Del.).

6

26.     The CPSC is an independent regulatory commission of the United States headquartered in Bethesda, Maryland. The CPSC is an "agency" under 5 U.S.C. § 551(1).

27.     The claims asserted in this case against the United States arise out of acts and/or omissions of officials, officers, agents, and/or other employees of the CPSC, including but not limited to, former CPSC Commissioner Richard Trumka, Jr. Trumka was nominated by President Biden and began serving a seven-year term on October 27, 2021. On or about May 8, 2025, President Trump removed Trumka from office.[3]

### Jurisdiction and Venue

28.     This Court has jurisdiction over this action under 28 U.S.C. § 1346(b)(1), 28 U.S.C. § 1346(b)(1), 28 U.S.C. §§ 2671-2680, and 15 U.S.C. § 2053(i).

29.     Venue in the District of Massachusetts is proper under 28 U.S.C. § 1402(b) and 28 U.S.C. § 1391(e)(1)(C), as Nested Bean is a resident of and its principal place of business is in this judicial district.

30.     This matter is timely filed. On July 17, 2025, Nested Bean served an administrative Claim for Damage, Injury, or Death (Standard Form 95) on the CPSC, which was delivered to the CPSC on July 18, 2025. A true and accurate copy of Nested Bean's administrative claim (excluding exhibits) and proof of delivery on July 18, 2025 is attached as Exhibit 1.

31.     As of the date of this Complaint, the CPSC has not responded to Nested Bean's claim. Because the CPSC has failed to make a final decision within six months of the filing of Nested Bean's administrative claim, it is deemed denied. Accordingly, Nested Bean has

---

[3] Trumka has challenged his removal in court, and his case is currently stayed in the United States Court of Appeals for the Fourth Circuit, pending a decision by the United States Supreme Court in *Trump v. Slaughter*, No. 25-332. *See Boyle, et al. v. Trump, et al.*, Case No. 8:25-cv-01628 (D. Md.).

7

exhausted its administrative remedies for these claims against the United States under the FTCA. *See* 28 U.S.C. § 2675(a).

**Statutory and Regulatory Landscape: Consumer Product Safety Act**

32.     Congress passed the Consumer Product Safety Act (Act) in 1972[4] to address what it found was the "unacceptable number of consumer products which present unreasonable risks of injury" to consumers. 15 U.S.C. § 2051(a)(1). Congress viewed a new federal regulatory regime to be necessary because existing federal regulation was "inadequate" and state and local regulation was "inadequate and may be burdensome to manufacturers." *Id*. § 2051(a)(4) & (5).

33.     The Act was passed: (1) "to protect the public against unreasonable risks of injury associated with consumer products"; (2) "to assist consumers in evaluating the comparative safety of consumer products"; (3) "to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations"; and (4) "to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." *Id*. § 2051(b).

34.     Congress established the CPSC as an independent five-member regulatory commission, with members appointed by the President with the advice and consent of the Senate. *Id*. § 2053.

35.     Among other things, the Act authorizes the CPSC to: "collect, investigate, analyze, and disseminate injury data, and information, relating to the causes and prevention of death, injury, and illness associated with consumer products"; "conduct research, studies, and investigations on the safety of consumer products and on improving the safety of such products"; "test consumer products and develop product safety test methods and testing devices";

---

[4] Pub. L. 92-573, § 4, Oct. 27, 1972, 86 Stat. 1210.

8

"promulgate consumer product safety standards" and rules; assist in developing and monitoring "voluntary consumer product safety standards"; address imminent hazards, including through litigation; and ban hazardous products. *Id*. § 2054, 2056, 2057, 2058, 2061, 2063, 2064.

36.     The CPSC can promulgate consumer product safety standards (including performance requirements, warnings, or instructions) where such standards are "reasonably necessary to prevent or reduce an unreasonable risk of injury associated with [a] product." *Id*. § 2056(a). But the CPSC is not permitted to issue a safety standard if a voluntary consumer product safety standard exists and "compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards." *Id*. § 2056(b)(1).

37.     The CPSC can ban hazardous products if they "present an unreasonable risk of injury" and "no feasible consumer product safety standard . . . would adequately protect the public from the unreasonable risk of injury associated with [the] product." *Id*. §§ 2057, 2058(f)(3)(C).

38.     Importantly, whenever the CPSC promulgates consumer product safety standards or bans a hazardous product, the CPSC must follow the requirements of the Act, as well as the Administrative Procedure Act (APA) and the Information Quality Act, under which the Office of Management and Budget issues information quality guidelines to "ensur[e] and maximiz[e] the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies." Pub. L. 106–554, 114 Stat. 2763 § 515.

39.     When the CPSC is authorized to promulgate a rule or a ban, the CPSC must follow specific notice-and-comment requirements, and must make several determinations supported by sufficient evidence and data. *See* 15 U.S.C. § 2058. The CPSC must "consider

9

relevant available product data including the results of research, development, testing, and investigation activities conducted generally and" under the Act. *Id*. § 2058(e); *see also id*. § 2058(f) (requiring regulatory analysis and findings before promulgating rule). The CPSC must also "give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions." *Id*. § 2058(d)(2).

40.     Under this authority, the CPSC has promulgated bans on a variety of consumer products, including unstable refuse bins, extremely flammable contact adhesives, lead paint, patching compounds and artificial ash and embers with free-form asbestos, lawn darts, children's toys and child-care articles with specified phthalates, crib bumpers, and inclined infant sleepers. *See* 16 C.F.R. pts. 1301-1310.

41.     CPSC has never promulgated a ban on Nested Bean's products nor on "weighted" infant products generally.

42.     Importantly, Section 6(b) of the Act also puts "unique restrictions" on the public disclosure of information about consumer products by the CPSC, individual Commissioners like Trumka, and CPSC staff. CPSC, CPSA Section 6(b) FACT Sheet, available at https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_CPSA6bFactSheet.pdf. *See generally* 15 U.S.C. § 2055; 16 C.F.R. §§ 1101 & 1105. *See also* 15 U.S.C. § 2055(d)(2) (disclosure provisions "shall apply whenever information is to be disclosed by the Commission, any member of the Commission, or any employee, agent, or representative of the Commission in an official capacity").

43.     The CPSC itself recognizes that Section 6(b) of the Act "applies to <u>any information</u> from which the public can readily ascertain the identity of a manufacturer or private

10

labeler of a consumer product." CPSC, CPSA Section 6(b) FACT Sheet, available at

https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_CPSA6bFactSheet.pdf (emphasis in original).

44.    Section 6(b) states: "The Commission shall take reasonable steps to assure, prior

to its public disclosure thereof, that information from which the identity of such manufacturer or

private labeler may be readily ascertained is [1] accurate, and that [2] such disclosure is fair in

the circumstances and [3] reasonably related to effectuating the purposes of this Act." 15 U.S.C.

§ 2055(b)(1).

45.    Before disclosing information of that type, the CPSC must give the manufacturer

an opportunity to comment on the accuracy of the information and the CPSC cannot disclose the

information for at least 15 days after sending it to the manufacturer for comment. *Id*. If the CPSC

decides to publish such information over the objection of a manufacturer, the CPSC must give

the company at least 5 days before disclosing the information, during which time the company

may file a lawsuit seeking to prevent its disclosure. *Id*. § 2055(b)(2) & (3).

46.    In other words, if the CPSC, an individual Commissioner, or any CPSC staff

member is going to disclose to the public information that would enable an average person to

easily identify a manufacturer, the CPSC must provide that manufacturer with notice and an

opportunity to comment, and must include any comments or other information provided by the

manufacturer in the CPSC disclosure. None of that was done here and none of the exceptions in

§ 2055(b)(4) apply here.

47.    If the CPSC publicly discloses "information that reflects on the safety of a

consumer product or class of consumer products, whether or not such information would enable

the public to ascertain readily the identity of a manufacturer or private labeler," Section 6(b)

requires the CPSC to "establish procedures designed to ensure that such information is accurate and not misleading" *Id*. § 2055(b)(6).

48.     CPSC established those procedures in 16 C.F.R. pt. 1101.

49.     Those regulations provide that information that meets the following criteria is "subject to the notice and analysis provisions of section 6(b)(1)": (1) the information "pertain[s] to a specific product which is either designated or described in a manner which permits its identity to be ascertained readily by the public"; (2) the information is "obtained, generated or received by the Commission as an entity or by individual members, employees, agents, contractors or representatives of the Commission acting in their official capacities"; (3) "[t]he Commission or its members, employees, agents or representatives . . . propose to disclose the information to the public"; and (4) "[t]he manner in which the product is designated or described in the information . . . permit[s] the public to ascertain readily the identity of the manufacturer or private labeler." 16 C.F.R. § 1101.11. The notice and analysis provisions of section 6(b)(1) were not followed here and none of the exceptions in § 2055(b)(4) apply here.

50.     Further, the notice and analysis provisions of 6(b)(1) apply if "a reasonable person receiving the information in the form in which it is to be disclosed and lacking specialized expertise can readily ascertain from the information itself the identity of the manufacturer or private labeler of a particular product." 16 C.F.R. § 1101.13. The regulations protect manufacturers by requiring the CPSC to "provide the advance notice and opportunity to comment if there is a question whether the public could readily ascertain the identity of a manufacturer or private labeler." *Id*. None of that was done here and none of the exceptions in § 2055(b)(4) apply here.

12

51.     The CPSC considers certain actions to be "reasonable steps to assure the accuracy of information it proposes to release to the public," including (1) CPSC staff or another qualified person or entity "conducts an investigation or an inspection which yields or corroborates the product information to be disclosed," or (2) CPSC staff "staff conducts a technical, scientific, or other evaluation which yields or corroborates the product information to be disclosed or the staff obtains a copy of such an evaluation conducted by a qualified person or entity." 16 C.F.R. § 1101.32(a). *See id.* § 1101.32(b) (describing steps CPSC will take to analyze accuracy of information it proposes to release to public). None of those things was done here with respect to the product's weighted feature.

52.     Further, the CPSC considers certain steps to be "reasonable to take to assure disclosure of information to the public is fair in the circumstances," including: (1) "accompany[ing] information disclosed to the public with the manufacturer's or private labeler's comments"; (2) "accompany[ing] the disclosure of information with an explanatory statement that makes the nature of the information disclosed clear to the public" and "disclos[ing] any other relevant information [CPSC's] possession that will assure disclosure is fair in the circumstances"; (3) "limit[ing] the form of disclosure"; and (4) "delay[ing] disclosure." 16 C.F.R. § 1101.33(a). None of those things was done here.

53.     Under these statutes and regulations, CPSC has established internal clearance procedures for reviewing and approving public communications about product safety. *See* CPSC Clearance Procedures for Providing Information to the Public Directives, Order No. 1450.2 (Jan. 16, 2023), available at https://www.cpsc.gov/About-CPSC/Policies-Statements-and-Directives/Clearance-Procedures-For-Providing-Information-To-The-Public-Directives.

13

54.    The purpose of that Order—which "applies Commission-wide, to all employees, agents and representatives (including contractors)"—is "[t]o assure that information disclosed to the public is accurate." *Id*. §§ 1(b) & 2.

55.    "The procedures [under Order No. 1450.2] apply to any release of information initiated by the Commission, including information disseminated on the agency's website, regardless of whether the information disclosed would enable the public to ascertain readily the identity of a manufacturer or private labeler. It applies to both oral and written disclosures." *Id*. § 1.

56.    The clearance procedures require "careful review and written approval" by designated CPSC staff before any public disclosure "to eliminate inaccurate or misleading statements." *Id*. § 7(a). Order No. 1450.2 is clear that "[n]o information shall be disclosed until approved as set out in this directive." *Id*.

57.    The clearance procedures requires five clearances: technical and scientific; program; editorial; policy decision; and legal. *Id*.

58.    Technical and scientific clearance requires that the statement be supported by: (1) data in CPSC's files or in currently applicable literature; (2) articulated technical judgment that is reduced to writing and based on consideration of all relevant factors; or (3) report prepared by a contractor to the CPSC that has been subject to a review process by CPSC staff. *Id*. § 7(a)(1). None of those things was adequately done here.

59.    Program clearance "means that the statement accurately reflects the status of programs and projects, enforcement activities, litigation, and planning, where appropriate." *Id*. § 7(a)(2).

14

60.     Editorial clearance "means that the statement retains style and coherence without changing technical, program, or legal meanings." *Id*. § 7(a)(3).

61.     Policy decision clearance "means that where there may be conflicts among various viewpoints on a statement among the technical and program staffs, the Executive Director will decide among the different viewpoints on the basis of Commission policy." *Id*. § 7(a)(4).

62.     Legal clearance "means that the statement is consistent with applicable laws and regulations, that any possibly inaccurate or misleading statements are eliminated and that any statements of Commission policy are accurate." *Id*. § 7(a)(5).

63.     CPSC has not fully explained whether, how, or why it cleared the guidance published on its website in late 2023 (as alleged below), and it is not clear that anything was done to clear any of Trumka's false and misleading statements.

64.     The clearance procedures also require the use of disclaimers "in all outside publications in which an employee uses his or her official title or states an affiliation with the Commission. The disclaimer shall read as follows: 'The opinion expressed by( ), an employee of the Consumer Product Safety Commission, does not necessarily represent the views of the Commission.'" *Id*. § 7(f)(2)(B). None of Trumka's statements included a disclaimer indicating the statements and communications were solely his views or that they do not necessarily represent the views of the CPSC. That alone rendered each of his statements misrepresentations about: (1) Trumka's authority; and (2) the source of the views espoused in his statements.

65.      If the CPSC finds that "it has made public disclosure of inaccurate or misleading information which reflects adversely upon the safety of any consumer product or class of consumer products, or the practices of any manufacturer, private labeler, distributor, or retailer of

15

consumer products, it shall, in a manner equivalent to that in which such disclosure was made, take reasonable steps to publish a retraction of such inaccurate or misleading information." *Id*. § 2055(b)(7); 16 C.F.R. § 1101.52 (procedure for retraction). Neither the CPSC nor Trumka retracted any of the false and misleading statements at issue here.

**Statutory and Regulatory Landscape:**
**Consumer Product Safety Commission Improvements Act of 1976**

66.     Under the FTCA, originally enacted in 1946, Congress waived sovereign immunity for certain tort claims for money damages against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

67.     Congress also created exceptions to the waiver of sovereign immunity in the FTCA, three of which are relevant here.

68.     First, under the due care exception, the United States retains sovereign immunity for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a).

69.     Second, under the discretionary function exception, the United States retains sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id*.

16

70.     Third, under the intentional torts exception, the United States retains sovereign immunity for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id*. § 2680(h).

71.     In 1976, Congress passed the Consumer Product Safety Commission Improvements Act of 1976 (1976 Act). Pub. L. 94–284 (S. 644), May 11, 1976, 90 Stat. 503.

72.     Among other things, the 1976 Act expanded the waiver of sovereign immunity for claims against the United States based upon certain actions or inactions by the CPSC or one of its employees, such as Trumka. *See* 15 U.S.C. § 2053(i).

73.      Specifically, the 1976 Act provides that the due care exception, the discretionary function exception, and the intentional torts exception do not prohibit bringing a tort claim for damages against the United States that "is based upon":

    a.  (1) "misrepresentation or deceit on the part of the Commission or any employee thereof," or

    b.  (2) "any exercise or performance, or failure to exercise or perform, a discretionary function on the part of the Commission or any employee thereof, which exercise, performance, or failure was grossly negligent,"

    c.  provided the tort claim "is not made with respect to any agency action (as defined in [5 U.S.C. § 551(13)])."

15 U.S.C. § 2053(i).

74.     Further, if such a tort claim is "based upon" the exercise, performance, or failure to exercise or perform a discretionary function, judgment may be entered against the United States only if the Court "determines (based upon consideration of all the relevant circumstances,

including the statutory responsibility of the Commission and the public interest in encouraging rather than inhibiting the exercise of discretion) that such exercise, performance, or failure to exercise or perform was unreasonable." 15 U.S.C. § 2053(i).

75.     Under these provisions, if a tort claim "is based upon" "misrepresentation or deceit" by the CPSC or an employee and does not constitute "agency action," then the due care, discretionary function, and intentional tort exceptions are inapplicable. Therefore, a plaintiff may bring *any* tort claim (even one listed in 28 U.S.C. § 2680(h)) if it is "based upon" conduct that amounts to "misrepresentation or deceit" by the CPSC or an employee (such as Trumka here) and does not constitute "agency action."

76.     If, instead, a tort claim is "based upon" the "grossly negligent" exercise, performance, or failure to exercise or perform a discretionary function that does not constitute "agency action," then the due care, discretionary function, and intentional tort exceptions are inapplicable, provided the Court determines the exercise, performance, or failure to exercise or perform the discretionary function was unreasonable. Therefore, a plaintiff may bring *any* tort claim (even one listed in 28 U.S.C. § 2680(h)) if it meets those requirements and the conduct is not "agency action."

77.     Importantly, a plaintiff may also bring other claims (like ordinary negligence) without meeting the requirements in 28 U.S.C. § 2053(i), but those claims would remain subject to the due care, discretionary function, and intentional tort exceptions.

78.     However, because Nested Bean alleges that Defendant: (1) violated Nested Bean's due process rights, and (2) failed to follow (or failed to exercise due care in following) a federal statute, regulation, or policy that specifically prescribed a course of action for Defendant to follow, the defenses in 28 U.S.C. § 2680(a) are not available to the Defendant.

18

79.    These provisions concerning FTCA claims against the CPSC or its employees were included in a section of the 1976 Act that Congress titled "Accountability." Pub. L. 94-284, §§ 4, 5(a), May 11, 1976, 90 Stat. 504.[5]

80.    The "Accountability" section originated with Senator James L. Buckley, a member of the Senate Commerce Committee, who spearheaded an amendment "to redress a serious inequity that has developed between the Federal Government and private parties." Senate Report No 94-251 (June 24,1975) S. Rep. 94-251, 47, 1976 U.S.C.C.A.N. 993, 1015. "When a regulatory agency damages an innocent private party as a consequence of inappropriate or incorrect use of its authority, the Government [unlike a private party] can, in most cases, use its sovereign immunity to shield the agency from the legal responsibility of its actions." *Id*. "Thus, hypothetically, the agency can be unjustifiably aggressive in pursuing its responsibilities without the reasonable fear of being held accountable for damage it may do if it is found to have acted unreasonably." *Id*. "The inequity between Government and private parties should be corrected by making these agencies—in this particular case, the Consumer Product Safety Commission— subject to tort action by private parties it has wronged." *Id*. "The Congress should, as a matter of justice, make available to these wronged parties a manner in which to recover damages." *Id*. "If Government is going to make business become more responsible for its actions, then the Government should be willing to apply the same standards to itself." *Id*.

81.    As a result, Senator Buckley proposed amending the bill to "authorize private parties who successfully challenge Government actions . . . to be compensated for damages

---

[5] The provisions were originally temporary and set to expire on January 1, 1978. *See* Pub. L. 94-284, §§ 4, 5(a), May 11, 1976, 90 Stat. 504. But the time limit was removed in 1978 because Congress concluded that the "Accountability" provisions had not proved to be an undue burden on the CPSC. *See* Pub. L. 95-631, § 2, Nov. 10, 1978, 92 Stat. 3742.

incurred by them as a result of malfeasance or negligence on the part of the Commission."
Senate Report No 94-251 (June 24,1975) S. Rep. 94-251, 47, 1976 U.S.C.C.A.N. 993, 1015.

82.    Senator Buckley explained further that "[t]he basic concept of [his] amendment [was] to remove the shield of sovereign immunity from Government regulatory functions" by the CPSC, thereby making the CPSC "suable under the Federal Tort Claims Act by withdrawing from the [CPSC] the right to frustrate a private party's suit by asserting the doctrine of sovereign immunity." 121 Cong. Rec. S13009-13045 at S13025 (daily ed. July 18, 1975); *see also id*. at S13026 ("[B]y adopting this amendment, we will make the [CPSC] liable for tortuous [*sic*] acts for which it would be held liable if it were not the Government.").

83.    Senator Buckley offered an example of a business called Marlin Toy Products, Inc., which suffered massive losses and was almost destroyed in 1973 as a result of the CPSC erroneously listing one of Marlin's toys on a list of banned products and refusing to correct it for six to eight months. Marlin had no remedy because the FDA and CPSC were protected under the FTCA as it existed then. Senate Report No 94-251 (June 24,1975) S. Rep. 94-251, 47, 1976 U.S.C.C.A.N. 993, 1015.; *see also* Proceedings & Debates of the 94th Congress, 121 Cong. Rec. S13009-13045 at S13026 (daily ed. July 18, 1975).

84.    Senator John Tower, who co-sponsored Senator Buckley's amendment, related a similar example—one that is nearly identical to what happened to Nested Bean.

85.    A company called Relco Industries manufactured an electrical arc welding device called "Wel-Dex." About 200,000 of the welders were used without injury from 1968 to early 1974, when Relco learned that CPSC received a complaint about the safety of the welder. Relco was willing to appear before CPSC and cooperate by suspending production pending the outcome of an investigation by CPSC. But CPSC "issued a press release just 8 days later

20

warning users of potential fatal shock hazards." Proceedings & Debates of the 94th Congress, 121 Cong. Rec. S13009-13045 at S13027 (daily ed. July 18, 1975). "Relco was given no opportunity to respond, nor any formal report of engineering defects in their product" before the press release went out. *Id*. This caused Relco "severe financial loss." *Id*. at S13028.

86.     As a result of these two and other incidents, the General Accounting Office investigated CPSC procedures and issued a report that "questioned the research methods used by the CPSC as well as its accuracy in reporting its findings to the public." *Id*.

87.     Senator Tower explained that "[i]n cases such as these, . . . there should be some avenue for redress for the private parties involved . . . Our amendment provides private parties with the right to sue the [CPSC] for damages resulting from unreasonable exercise of discretionary functions," with the goal of "encourage[ing] responsible and prudent action on the part of the [CPSC]." *Id*.

88.     Representative John Askbrook introduced a nearly identical amendment to the House bill, explaining that "it would allow private parties to sue the [CPSC] for torts it commits against them." Proceedings & Debates of the 94th Congress, 121 Cong. Rec. H10198-10218 at H10208 (daily ed. Oct. 22, 1975). "The Federal Government should bear legal responsibility for its tortuous [*sic*] acts just as private parties are required to do. A wronged party should be able to obtain a just remedy from his or her own government." *Id*. at H10209. Representative Ashbrook explained that his "amendment would give private parties who have been wronged by the [CPSC] the opportunity to recover damages," and it "would prevent that Commission from hiding behind the cloak of sovereign immunity." *Id*.

89.     Senator Buckley's proposal took hold and ultimately became part of the 1976 Act. Pub. L. No. 94-284, §§ 4, 5(a) 90 Stat. 504 (May 11, 1976).

90.     These amendments—intended to allow private parties to hold the CPSC accountable—were designed to address precisely the harm for which Nested Bean seeks redress in this lawsuit.

**Factual Allegations**

***Nested Bean***

91.     Nested Bean develops, designs, manufactures, and sells infant and toddler products, including infant swaddles, sleeping sacks, and pajamas that are "lightly weighted" to mimic the gentle and reassuring touch of a parent. Nested Bean coined the phrase and marketed its products as "weighted"—though Nested Bean's products are among the lightest weighted of any "weighted" infant sleep products.



92.     Nested Bean is a small, immigrant, minority, and woman-owned business founded in 2011 as an outgrowth of its founder Manasi Gangan's struggle to find a solution to help her own child sleep restfully an independently as a working mother of a baby who could not fall

asleep unless she placed her hand gently on the child's center. As soon as her hand was removed, her child would wake immediately.

93.    Ms. Gangan, a 15-year veteran in the technology industry, set out to create a product that would effectively and safely provide the baby with the proven benefits of the sense of being comforted with touch, in a manner that is consistent with safe sleep guidance, such that it would place babies on their back, in the crib, without any loosely placed aids. Nested Bean's products are designed to foster safe sleep practices by allowing parents—who may otherwise resort to unsafe practices such as co-sleeping with their baby or using inclined products for sleep—to place infants in a safe crib environment with no soft bedding or other objects.

94.    Ms. Gangan was inspired by neonatal units in hospitals that were utilizing positional aids with polypropylene filling to simulate the familiar pressure experienced in the womb or from parental touch, mimicking the touch or cradling of a caregiver's hand.

95.    Encouraged by neonatal research study results on the soothing effects of parental simulated touch, Ms. Gangan embarked on a mission to create a solution that would provide restful sleep for both little ones and their parents. Ms. Gangan began her efforts to develop a line of sleepwear that is designed to mimic the gentle touch of a parent who instinctively places their hand on her baby's chest to help soothe the baby back to sleep.

96.    Ms. Gangan's experience in product development and risk assessment guided her cautious approach to the design and development of the new innovative sleepwear.

97.    In designing Nested Bean's products, Ms. Gangan followed guidance of the International Organization for Standardization (ISO) for consumer product safety (ISO 10377), which is defined as "freedom from unacceptable risk."[6] Ms. Gangan also followed CPSC

---

[6] ISO 10377:201 (Terms & Definitions), available at https://www.iso.org/obp/ui/en/#iso:std:iso:10377:ed-1:v1:en.

recommendations for best practices, including that the "product not only meets or exceeds the requirements of federal safety laws, but also is designed and manufactured as safely as possible."[7]

98.     Ms. Gangan sought advice from sleep safety experts and safety labs to ensure that safety was front and center throughout the design, development, and production phases.

99.     Nested Bean shared early designs and prototypes with accredited safety labs for design evaluations. Based on the safety lab's evaluations and recommendations received during the design and development phase, Nested Ban made critical design changes to prevent rebreathing through the parts containing filling.

100.     Nested Bean updated the prototype and shared it with human factor design experts to receive safety evaluations. Nested Bean then adopted the experts' safety recommendations.

101.     Nested Bean also consulted with an accredited safety lab to receive a comprehensive report of mandatory and some voluntary safety test recommendations using international test methods from major global territories such as the United States, Canada, Europe, China, and Japan.

102.     Materials chosen through the supply chain underwent applicable mandatory testing, as well as additional voluntary testing.

103.     Nested Bean then consulted with safety experts to define the warnings to be added to product labels.

104.     All these safety measures in the design, development, and production of Nested Bean's products were taken in 2011 and 2012, before a single product went to market.

---

[7] CPSC Manufacturing Best Practices, available at https://www.cpsc.gov/business--manufacturing/business-education/business-guidance/BestPractices.

24

105.    Nested Bean designed a sleepwear product with sewn-in filling in the form of a lightly weighted pad applied to the infant's upper torso.

ZEN ONE™ CLASSIC



106.    The pad weighs between 30-90 grams, depending on the baby's size and the area over which it is applied. The pad's location of application and area of distribution are designed to maintain a certain mass-over-area ratio proportionate to the infant's body weight for ages up to 24 months.

107. In fact, the pad's weight for the smallest babies starts at just 30 grams—the equivalent of 6 quarters or just about 1 ounce. One ounce is about $1/112^{th}$ (0.0089%) the weight of the smallest child who can use the product, as indicated on product labels. As babies age to over 15 months, larger sizes never use more than 90 grams (or about 3 ounces) of distributed weight.

108. The mass of this added filling is light enough to mimic a parent's gentle palm and isolated enough on the chest to not hinder the child's mobility or cause overheating.

109. It is comparable in weight and location to the mass of other products commonly found in a baby's environment, such as a car seat chest clip (which Nested Bean shared with the CPSC during its July visit described below), or a plushie (to hold a pacifier in place) that rests on the baby's chest as the baby sleeps.

110. Ms. Gangan's unwavering commitment to safety, innovation, and research underpins Nested Bean's success, which is demonstrated by the stellar safety record the company has maintained after selling over 2.5 million products.

111. There has been no hazard pattern identified with Nested Bean's products, nor any injuries or deaths attributed to them. In fact, in 2023 the CPSC conducted a safety review of three of Nested Bean's products to evaluate a potential of suffocation risk, and CPSC staff concluded that the produced did not need any further action.

112. Consistent with its outstanding safety record, Nested Bean remains committed to safety and compliance. Nested Bean frequently reviews CPSC regulations for infant clothing and infant sleepwear and other adjacent industries to determine whether there is any possible application to Nested Bean's products' innovative features, and whether Nested Bean should voluntarily apply the regulation in an effort to continuously improve the safety of its products.

113.    Nested Bean's commitment to safety included commissioning a preliminary unpublished study in 2022 to 2023, at its own expense, to investigate the potential effects of applying incremental weights to an infant's chest. Five infants between 2 and 5 months of age participated. The study found that the pulse rate and the oxygen saturation recorded at 30 grams were within allowable healthy ranges.

114.    Each of Nested Bean's products applies a weight concentration ratio of 30 grams (1 ounce) over 10.6 square inches. Therefore, while its products may (depending on the infant's age or the area over which the filling is applied) include up to 90 grams (3 ounces) of filling, the weight concentration is maintained at the ratio of 30 grams over 10.6 square inches by distributing the added filling over a proportionately wider area.

115.    While the study was preliminary, Nested Bean shared its findings with the wider infant and juvenile industry to enhance the collective knowledge of all stakeholders and prompt continuous research. The stakeholder group included among others, CPSC staff, infant gear manufacturers that design products that have chest harnesses and chest clips applying an equivalent pressure to the chest, product safety testing labs, and product safety research labs.

### *ASTM International & Nested Bean's Role*

116.    ASTM International, formerly known as the American Society for Testing and Materials, is an organization that develops technical standards for a wide range of materials, products, systems, and services.

117.    ASTM is a private, voluntary consensus standards development organization that creates and maintains product standards using a rigorous approach to assure that standards are developed in an open, fair, and balanced system with input from all stakeholders.

118.    ASTM Committee F15 on Consumer Products was established in 1973 at the request of the CPSC. Since then, the CPSC has collaborated with ASTM to create voluntary standards for emerging hazards.

119.    In or around 2021, ASTM Committee F15 created a subcommittee, F15.19, on Infant Bedding. *See* ASTM Subcommittee F15.19 on Infant Bedding, available at https://www.astm.org/membership-participation/technical-committees/committee-f15/subcommittee-f15/jurisdiction-f1519

120.    To date, the ASTM Subcommittee F15.19 on Infant Bedding, which purportedly includes "weighted" infant sleep products, has not reached a consensus on the definition or voluntary product standards for those consumer products.

121.    Given its stellar safety record and experience of almost 15 years, Nested Bean is committed to helping the ASTM committee's ongoing effort to create definitions and standards for its wearable infant sleep products (including Nested Bean's) to raise the bar on infant sleep safety and to protect consumers from unscrupulous manufacturers.

122.    There is no legal definition or consensus definition among stakeholders of the term "weighted." Therefore, numerous manufacturers are selling infant products with filling that is significantly heavier than Nested Bean products, some of which are not labeled or marketed as "weighted." There are products that contain 0.5 lbs. to 1.5 lbs. of additional filling, compared to 1 ounce to 3 ounces of filling added in Nested Bean products. Indeed, some infant sleep products from other manufacturers, with extra filling for winter months or colder temperatures but not marketed as "weighted," actually weigh significantly more than a Nested Bean product that is marketed as "weighted."

28

123.    Nested Bean has actively contributed to the collaborative process with the ASTM F15.19, the Wearable Infant Blankets Subcommittee, to help work towards developing a voluntary safety standard for wearable infant blankets and Swaddles. Nested Bean has dedicated significant resources and supported independent research and consumer studies to bring greater insight to demonstrate how innovation can be balanced with safety.

### Safe to Sleep/Back to Sleep Campaign

124.    The Department of Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC), and the National Institutes of Health (NIH), are authorized by Congress to engage in activities, collect date, and assess various approaches related to stillbirth, sudden unexpected infant death, and sudden unexplained death in childhood. 42 U.S.C. §§ 300c-13, 300c-14.

125.    The Sudden Infant Death Syndrome (SIDS) Act of 1974 (Public Law 93-270) directed the National Institute of Child Health and Human Development (NICHD), a subset of NIH, to lead federal research efforts to identify the causes of SIDS, develop preventive strategies, and provide information to reduce the public about SIDS.

126.    In 1994, the Safe to Sleep campaign began, led by the Eunice Kennedy Shriver National Institute of Child Health and Human Development, which was part of NIH. See NIH Safe to Sleep, Campaign History, available at https://safetosleep.nichd.nih.gov/campaign/history.

127.    The Safe to Sleep campaign was originally called the Back to Sleep campaign, "then named for its main recommendation for all healthy babies to be placed on their backs to sleep to reduce the risk of" SIDS. *Id*.

128.    Since then, the campaign has expanded "to address not only SIDS, but also other sleep-related infant deaths." *Id*.

129.    The NICHD collaborates with other federal agencies for the Safe to Sleep campaign, including the CDC and CPSC, as well as other organizations, including the American Academy of Pediatrics (AAP). NIH Safe to Sleep, Collaborators & Partners, available at https://safetosleep.nichd.nih.gov/campaign/partners.

### AAP, NIH, and CDC Safe to Sleep Guidance in 2022

130.    On June 21, 2022, the AAP published its Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment,[8] which: (1) "recommended that weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects not be placed on or near the sleeping infant"; and (2) stated that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe and therefore not recommended".

131.    However, the AAP did not define "weighted," did not specify how much added weight it deemed unsafe, and did not point to any data to support these recommendations.

132.    The only evidence cited for AAP's position in its 2022 Technical Report was a single study that **did not recommend against the use of weighted sleepwear**.[9]

133.    Instead, that single study from 2020 ("2020 NICU Study") identified no adverse events; vital signs were stable throughout blanket use in the 16 neonatal intensive care unit infants that were observed; and the study's findings were "consistent with previous research that found no adverse events when weighted blankets or weighted vests were used."[10] Indeed the

---

[8] Exhibit 2, AAP 2022 Policy Statement, Sleep-Related Infant Deaths: Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment, available at https://publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated-2022?autologincheck=redirected; Exhibit 3, AAP 2022 Technical Report, Evidence Base for 2022 Updated Recommendations for a Safe Infant Sleeping Environment to Reduce the Risk of Sleep-Related Infant Deaths, available at https://publications.aap.org/pediatrics/article/150/1/e2022057991/188305/Evidence-Base-for-2022-Updated-Recommendations-for.

[9] AAP 2022 Technical Report at 20, 27 & n.327.

[10] Exhibit 4, V. Summe, et al., Safety, Feasibility, and Effectiveness of Weighted Blankets in the Care of Infants With Neonatal Abstinence Syndrome: A Crossover Randomized Controlled Trial, 20 *Advances in Neonatal Care* 384, 389

2020 NICU Study's "initial findings [were] that **weighted blankets may be beneficial** in decreasing [neonatal abstinence syndrome] symptoms."[11]

134.    Economist Emily Oster, Ph.D., has explained that the AAP's statement that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe . . . implies . . . that there is some demonstrated evidence of lack of safety."[12] But, Dr. Oster observes: "[T]he only evidence cited in this discussion is a paper that demonstrated that weighted blankets could be used safely (and with some efficacy) among a sample of 16 infants with neonatal abstinence syndrome. **To be clear: this paper is evidence of safety. There is no data cited suggesting danger.**"[13]

135.    The AAP acknowledged that the 2020 NICU study "found no adverse events when a 1-pound weighted blanket was placed on each infant for 30 minute observed episodes."[14]

136.    Nevertheless, the AAP's 2022 Technical Report recommended **against** "weighted" blankets, sleepers, and other products, despite the 2020 NICU study, because "no studies have documented the safety of weights for infants in an unobserved, nonclinical sleep environment."[15] In other words, the recommendation of the AAP was not based on data—but on a **lack of data**.

137.    The AAP failed to acknowledge that the lack of safety incidents attributed to Nested Bean products (despite selling more than 2.5 million units for over a decade) is in fact data and empirical evidence of their safety.

---

(2020), available at https://gravite.fr/wp-content/uploads/2021/08/Weighted-Blankets-in-the-Care-of-Infants-With-Neonatal-Abstinence-Syndrome.pdf  (2020 NICU Study).

[11] *Id*. at 390 (emphasis added).

[12] Exhibit 5, E. Oster, Ph.D., The Data Behind Safe Sleep: What Does (And Doesn't) Reduce the Risk of SIDS, ParentData, available at https://parentdata.org/babies/data-behind-safe-sleep/.

[13] *Id*. (emphasis added).

[14] AAP 2022 Technical Report at 20.

[15] AAP 2022 Technical Report at 20.

138.    Despite the lack of scientific evidence of danger, the AAP's 2022 recommendations led the NIH and CDC to issue identical policy positions.

139.    On June 27, 2022, the NIH published Safe to Sleep guidance based on the AAP's recommendations, stating "[t]here is not enough evidence that weighted blankets and swaddles are safe to use for babies in the home."[16] Neither NIH nor the AAP cited any studies showing that weighted blankets or swaddles were unsafe for babies in the home. Instead, NIH downplayed the significance of the 2020 NICU Study showing the product was safe.

140.    CDC likewise followed the AAP's 2022 guidance. Its website states: "Products labeled as weighted—including weighted sleepers, swaddles, sleep sacks, and blankets—are **not safe** for infants."[17] No research or scientific studies are cited to support this statement. Instead, the webpage simply states that "CDC supports the recommendations issued by the [AAP] to reduce the risk of all sleep related infant deaths."[18]

141.    In short, the AAP's misuse of the 2020 NICU Study, lack of regard for empirical data, and lack of specificity in stating its concern, led the AAP to create broad and misleading guidance that was based on speculation, without evidence or research. This guidance was blindly adopted by the NIH and CDC, and later the CPSC, disregarding their own obligations to validate the data under each agency's governing statutes and regulations.

142.    On information and belief, CPSC and Trumka specifically were closely involved with the development and release of these guidelines by the AAP, NIH, and CDC in 2022, including through close cooperation with the AAP, NIH, and CDC on SIDS, and through private

---

[16] Exhibit 6, NIH Safe to Sleep, Frequently Asked Questions, available at https://safetosleep.nichd.nih.gov/reduce-risk/FAQ.

[17] Exhibit 7, CDC Helping Babies Sleep Safely, available at https://www.cdc.gov/reproductive-health/features/babies-sleep.html#:~:text=If%20you're%20worried%20about,from%20Safe%20to%20Sleep%C2%AE.

[18] Id.

meetings and communications between Trumka and his staff and Dr. Rachel Moon—the lead author of the AAP 2022 Policy Statement and AAP 2022 Technical Report.[19] This was the start of Trumka's attempts to ban or at least regulate weighted infant sleep products including Nested Bean's.

143.    However, Nested Bean was not aware of the CPSC and Trumka's potential involvement in developing and releasing the AAP's, NIH's, and CDC's recommendations until after Trumka's campaign against Nested Bean and weighted products became clear in April 2024, as explained in more detail below. That is in part because there was no clear definition of what "weighted" infant sleep products even meant, and because Trumka's role did not become clear until much later. What is clear now is that Trumka was engaging in a continuing course of conduct going back to at least 2022 through which he unlawfully attempted to destroy Nested Bean's business through an illegal one-man ban of weighted infant sleep products including Nested Bean's based on evidence-free and anti-science statements that Trumka knew or recklessly disregarded were false and misleading. This campaign of misrepresentations, with no due process, is what Nested Bean seeks redress for in this lawsuit.

### CPSC's Awareness of Nested Bean's Preliminary 2022/2023 Sleep Study

144.    Trumka ignored information about the safety of Nested Bean's products that Nested Bean provided to CPSC.

145.    On April 27, 2023, Nested Bean shared the results of its preliminary research study described above and other analyses with all ASTM F15.19 subcommittee members

---

[19] Exhibit 8, *See, e.g.*, May 4, 2022, Log of Meeting, Office of Commissioner Trumka (telephone call between Trumka, Trumka's staff, and AAP official Dr. Rachel Moon re: "[f]ollow-up phone call re factors affecting SIDS in US"), available at https://www.cpsc.gov/s3fs-public/Follow-up-call-re-SIDS-5-4-22.pdf?VersionId=nDZIt3pi9bRTsElkVV40WKpzPtMpDRXW; Exhibit 9, Aug. 3, 2022, Log of Meeting, Office of Commissioner Trumka (telephone call between Trumka's staff and Dr. Moon re: "[f]ollow-up discuss re SIDS, safe sleep practices, and SSBA [Safe Sleep for Babies Act]"), available at https://www.cpsc.gov/s3fs-public/2022-08-03-Telephone-call-with-UVA-Child-Health-Research-Center.pdf?VersionId=SvP3Hg5ojI.6tRZkCg1VjifqrUn7RK4n.

including CPSC staff members.[20] Ms. Gangan then conducted a review of the study and related

materials on May 8, 2023 at a meeting with some recipients of the April 27 communication,

including two CPSC staff members. As a follow up to that meeting, on May 10, 2023, Ms.

Gangan once again emailed the results of Nested Bean's sleep study with a few updates to ASTM

F15.19 subcommittee members and CPSC staffers.[21]

146.    On June 12, 2023, ASTM F15.19 subcommittee members including CPSC

staffers attended a meeting where Nested Bean's research study was reviewed.

147.    Then between July 20 and July 24, 2023, Nested Bean and its attorney met with

CPSC Chair Hoeh-Saric, Commissioner Boyle, Commissioner Feldman, and Duane Boniface (a

senior official of the CPSC Staff) to review Nested Bean's products, safety, and present the

Nested Bean research and other scientific studies that guided Nested Bean's product

development and testing throughout its prototyping, development, and manufacturing process.

Nested Bean also shared its plans to conduct a sleep research study guided by its preliminary

research that concluded in March 2023. Nested Bean sent letters to each of those Commissioners

on August 7, 2023 as a follow-up to the meetings, and included appendices with information

about the studies that Nested Bean commissioned and others on which it relied when developing

its product.[22]

148.    Nested Bean believed this effort would help both the ASTM and the CPSC

understand Nested Bean's product and its safety. That is why Nested Bean repeatedly met with

CPSC Commissioners and staffers between April and July 2023. The only reason Nested Bean

---

[20] Exhibit 10, April 27, 2023 Email from M. Gangan to ASTM Committee, CPSC, et al. re: Nested Bean Product Design Safety Research Study Reports.
[21] Exhibit 11, May 10, 2023 Email from M. Gangan to ASTM Committee, CPSC, et al. re: Nested Bean Product Design Safety Research Study Reports.
[22] Exhibit 12, August 7, 2023 Letters from Nested Bean to CPSC Commissioners Hoehn-Saric, Boyle & Feldman.

did not meet with Trumka during that time is that he refused to meet with manufacturers or other industry representatives. His practice was to turn a blind eye to facts and safety data.

### *The CPSC Rejects Trumka's Attempt to Ban or Regulate Weighted Infant Sleep Products*

149.    In 2023, Trumka continued his attempts (started no later than 2022) to ban or at least regulate "weighted" infant sleep products, and when the CPSC thoroughly rejected his attempts to do so, Trumka tried to do it on his own.

150.    In early 2023, the CPSC's Office of Compliance and Field Operations conducted a four-month review of Nested Bean's products to assess the risk of suffocation by the product potentially rising above an infant's nose and mouth, as this is a hazard pattern seen commonly across wearable infant sleep products. The evaluation included, among other factors, a thorough assessment of the submitted products' neck and arm hole measurements. After reviewing Nested Bean's products, the Office of Compliance and Field Operations found no identifiable hazard patterns related to the risk of suffocation. Therefore, on April 5, 2023, the Office of Compliance and Field Operations sent Nested Bean a closing letter stating that no further action was warranted.[23] In other words, **CPSC's own review of Nested Bean's products showed no identifiable hazard related to suffocation**.

151.    The CPSC and Trumka therefore knew about but ignored CPSC's own findings about the safety of Nested Bean's product, and Trumka continued his crusade against weighted infant sleep products (including Nested Bean's) anyway.

152.    At the May 10, 2023, CPSC Public Hearing on Fiscal Years 2024 and 2025 Commission Agenda and Priorities,[24] Trumka stated that "there are concerns as to the hazard" of

---

[23] Exhibit 13, April 5, 2023 Letter from CPSC to Nested Bean.
[24] Exhibit 14, CPSC Public Hearing on Fiscal Years 2024 and 2025 Commission Agenda and Priorities, available at https://www.cpsc.gov/Newsroom/Public-Calendar/2023-05-10-100000/Public-Hearing-on-Fiscal-Years-2024-and-2025-Commission-Agenda-and-Priorities.

"weighted sleep sacks and swaddle products like that," and he inaccurately stated that the "AAP has mentioned a lack of utility" of these products.[25] Neither the AAP 2022 Policy Statement nor the AAP 2022 Technical Report say **anything** about the utility of "weighted" products. Rather, the only study cited in that report found that weighted blankets "may be beneficial." Further, Trumka did not define what he meant by "weighted…products" with any specificity.

153.    Yet Trumka went on to admit that he was prepared to ignore the legal restrictions placed on the CPSC: "I think when we have that combination of things, **it might not even be worth our time to be engaged in voluntary standards discussions**, on products that lack utility and do pose a hazard."[26] In other words, Trumka openly stated that he wanted to ignore the statutorily required analysis as to whether voluntary standards would be effective.

154.    A Consumer Reports article originally published on July 26, 2023, included that quote from Trumka and specifically identified Nested Bean and one other competitor as companies "now marketing weighted sleep products—including wearable blankets and swaddles—for babies, even newborns." The article went on: "That's raising alarm among pediatricians and many product safety experts, including those at Consumer Reports, who say that these products are being sold with no safety standards in place and little to no evidence that they're safe."[27]

155.    Indeed, the author of that Consumer Reports article that quoted Trumka and portrayed Nested Bean's products as unsafe, posted a video to her Instagram account that showed

---

[25] Commission Agenda & Priorities for Fiscal Years 2024 & 2025, YouTube, available at https://www.youtube.com/watch?v=f4ZB_bRLbgI&t=10858s (starting at 3:00:58).

[26] *Id*. (emphasis added).

[27] Exhibit 15, Kirchner, "Pediatricians Warn That Weighted Baby Blankets, Sleep Sacks, and Swaddles Are Not Safe," Consumer Reports (published July 26, 2023; updated Aug. 2, 2024), available at https://www.consumerreports.org/babies-kids/child-safety/weighted-baby-blankets-sleep-sacks-swaddles-are-not-safe-a6236206799/.

an image of an infant wearing a Nested Bean product with the text: "If you own a weighted baby

blanket, sleep sack, or swaddle, stop using it."[28]:



---

[28] Instagram (@consumerreports) (July 27, 2023), available at
https://www.instagram.com/p/CvNnk2PtRY5/?utm_source=ig_embed&utm_campaign=embed_video_watch_again.

156.    Trumka's attempt to unilaterally regulate weighted infant sleep products was already beginning to take hold.

157.    Notwithstanding Trumka's efforts, the ASTM F15.19 subcommittee had been hard at work developing a voluntary safety standard for wearable infant blankets and swaddles alongside CPSC staff since the subcommittee was formed in 2021. The focus was to provide performance standards for fit and construction as well as sizing and warnings to help address the potential hazard of suffocation resulting from a child slipping below the neck hole (known as "submarining") in any wearable sleep product, regardless of weight.

158.    In May 2023, CPSC staff provided the ASTM F15.19 subcommittee two years of reported incident data so the subcommittee could assess whether the performance requirements in the voluntary standards that the subcommittee was drafting adequately addressed any hazard patterns in the incident data.

159.    As explained above, between April and July 2023, Nested Bean gave CPSC staff detailed voluntary safety test data and related scientific research about Nested Bean's products and met with CPSC staff members several times to explain this data. *See supra* at ¶¶ 145-147. Ms. Gangan and Nested Bean's legal counsel met with then CPSC Chair Hoehn Saric and Commissioners Boyle and Feldman between July 20 and July 24, 2023 at CPSC's Maryland offices. [29]

160.    Nested Bean did not meet with Trumka because he refused to take meetings with manufacturers or industry representatives. So, Nested Bean met with three of his co-Commissioners (including the Chair).

---

[29] Exhibit 12, August 7, 2023 Letters from Nested Bean to CPSC Commissioners Hoehn-Saric, Boyle & Feldman.

38

161.    The purpose of these meetings was to share the concept of simulated touch and the research that had been conducted on the subject, as well as Nested Bean's preliminary research and plan to conduct a longer sleep study over the next 12 to 18 months. Nested Bean's presentations and follow-up letters included evidence of the minimal weight (between 30 to 90 grams or 1 to 3 ounces) carefully embedded in its products and the products' careful designs, which avoid the risk of suffocation, overheating, and mobility restriction—all known risks based on ten years of publicly available safety incident data across wearable infant sleep products.

162.    The work of the ASTM F15.19 subcommittee resulted in ASTM Work Item WK81176—Draft Standard Consumer Safety Specification for Wearable Blankets Intended for Use by Infants and Toddlers, which was submitted to the CPSC in October 2023. These proposed voluntary standards included safety-enhancing performance requirements across all wearable sleep products. On October 2, 2023, the CPSC staff provided comments on the draft to the ASTM subcommittee, including that the CPSC "[w]ould like to see ASTM continue work on wearable blankets with weighted features to develop performance standards that would not allow blankets that are unsafe," but noted that "**we do not have specific recommendations at this time**."[30]

163.    Then, on October 11, 2023, during the CPSC meeting to discuss the 2024 fiscal year operation plan, CPSC's then Executive Director Jason K. Levine confirmed that CPSC staff wanted to include a "weighted infant sleep products" category in the broader ASTM voluntary standard being developed for all "wearable infant sleep products."[31] Levine stated that adopting

---

[30] Exhibit 16, Oct. 2, 2023 Letter from CPSC to ASTM F15.19 Subcommittee, available at
https://www.cpsc.gov/s3fs-public/Weighted-products-in-Scope-F15-19-ASTM-Letter-October-2023-FINAL.pdf?VersionId=80RkAGL95ddMTTdaDOw2pAub3Mz6j.Jj (emphasis added).

[31] CPSC Commission Meeting FY '24 Operating Plan Briefing (Oct. 11, 2023), *available at* https://www.youtube.com/watch?v=Vj7d7gb4DFc&t=3630s (starting at 1:00:30).

such a standard for the "weighted" category would be a safety improvement. *Id.* He further stated that, since there was no market consensus definition for "weighted" product, CPSC saw value in working with stakeholders to craft a definition to adequately address safety. *Id.* The then Executive Director added that CPSC Staff did not have a position on AAP's "weighted" products recommendation because all wearable sleep products have some weight. *Id.* But, he continued, CPSC staff was eager to work with the AAP to define "weighted" infant sleep products to further their safety. *Id.*

164.    Trumka stated at that hearing that he hoped the effort to create a voluntary standard for weighted infant sleep products "fails" because if it succeeded it would lend the products "legitimacy," *id*. at 1:11:00, which would undermine his attempts to ban them.

165.    On November 8, 2023, the CPSC convened an internal meeting to discuss and potentially amend the upcoming Fiscal Year 2024 Operating Plan. During this meeting, Trumka proposed an amendment to require CPSC "staff to initiate rulemaking and issue a proposed rule to address risks associated with weighted infant blankets, sleepers, and swaddles and align the Commission's Safe to Sleep guidance and [CDC] and [NIH] guidance for weighted products."[32]

166.    At that time, however, Trumka knew that neither the NIH nor the CDC was authorized to make product safety determinations, and he was aware that neither agency had actually conducted any research about the use of weighted infant sleep products or independently verified any third-party recommendations.

167.    Trumka also knew that the NIH and CDC had simply repeated non-binding guidance from the AAP. As explained above, the AAP's better-safe-than-sorry approach was based not on evidence or scientific data, but hypothetical, undocumented, and unproven safety

---

[32] Exhibit 17, CPSC, Minutes of Commission Mtg. 13 (Nov. 8, 2023) https://www.cpsc.gov/s3fs-public/Comm-Mtg-Min-FY-2024-Operating-Plan-Decisional.pdf?VersionId=GDwWSUy29P7SN9MpqVVWdX5Nn9xe36Vm.

concerns that were contradicted by the only scientific evidence referenced in the AAP's policy statement and technical report.

168.    Commissioner Trumka's proposed amendment was rejected by the Commission in a 3-1 vote, with Trumka being outvoted by all other Commissioners at the time[33] (two of whom, like Trumka, were nominated by President Biden). *Id.*

169.    In rejecting the proposal, Chairman Hoehn-Saric explained "[his] understanding that [CPSC] staff ha[d] not conducted the research necessary to draft a notice of proposed rulemaking in 2024," and that "simply directing [the staff] to do it or wishing something to happen doesn't reflect the work that has to go into a successful rulemaking that ultimately reflects the science and can be sustained over time."[34] The Chairman added that "staff is very aware of the issue and working diligently to assess and quantify safety risks associated with weighted [sic] blankets." *Id.* Commissioner Boyle and then-Commissioner Feldman agreed that rulemaking "at this time [was] premature." *Id.* at 21:52–22:05.

170.    After getting outvoted 3-1, Trumka decided to take matters into his own hands. He started by issuing a statement on November 8, 2023, that weighted infant sleep products pose "glaring", "concerning," and "alarming" hazards, despite the absence of any evidence supporting those statements.[35] Trumka attacked his fellow Commissioner for failing to "act faster and more boldly," apparently even if such "fast" and "bold" action were not based on science, evidence, or any legally required process to regulate the products. *Id.*

---

[33] One seat was vacant at the time of the vote.

[34] *See* CPSC, Commission Meeting FY24 Operating Plan Decisional at 20:28−20:55 (Nov. 9, 2023), https://www.youtube.com/watch?v=LHemQpZZBN0.

[35] Exhibit 18, Nov. 8, 2023 Statement of Commissioner Richard Trumka, CPSC Operating Plan Fails to Address Glaring Safety Concerns: Commissioner Trumka Forced to Vote "No", available at https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/CPSC-Operating-Plan-Fails-to-Address-Glaring-Safety-Concerns-Commissioner-Trumka-Forced-to-Vote-%E2%80%9CNo%E2%80%9D.

171.    Trumka began to execute on a scheme to bring about the same result he could not achieve legally: ban or stop the sale of all weighted infant sleep products, including Nested Bean's, even if doing so meant using illegal means and methods instead of following the laws and regulations that govern CPSC's regulatory activity.

172.    In fact, Trumka made no secret of his disdain for the legal requirements that restricted his (and other CPSC Commissioners' and employees') ability unilaterally to make statements with the imprimatur of the CPSC. On February 8, 2023, Trumka put out a statement explaining his view: "I should be able to warn you when I know about a dangerous product so you can use that information to protect your family."[36] No matter that Trumka alone is not the CPSC. No matter that statutes and regulations govern all officials and employees at the CPSC. "[T]here is no room for us to *stop ourselves* from doing the right thing.  We owe consumers more than that." *Id*. (emphasis in original).

173.    And that is what Trumka did: he ignored the legal restrictions on disclosure of information by the CPSC and went on a one-man crusade based on his own opinions and beliefs. Not science. Not data. Not the considered views of the CPSC. Just Trumka's own beliefs.

174.    For its part, after rejecting Trumka's proposal, the CPSC continued to work with the ASTM F15.19 subcommittee on developing voluntary standards. In a November 16, 2023 letter from the CPSC to the ASTM F15.19 subcommittee, the CPSC "not[ed] a lack of publicly available research relating to [the safety of weighted products]," and explained that CPSC "staff has collected and measured a variety of wearable blankets and swaddles marketed as weighted

---

[36] Exhibit 19, Feb. 8, 2023 Trumka Statement, CPSC Must Fix Gag Rule Regulations So Consumers Can Protect Their Families, available at https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/CPSC-Must-Fix-Gag-Rule-Regulations-so-Consumers-Can-Protect-Their-Families#_ftn1.

('weighted') and a variety of those products without any such marketing ('non-weighted') currently sold on the market."[37]

175.    CPSC's market scan data show that the total weight of many "non-weighted" products weighed as much or more than the "weighted" products. *Id.*

176.    While not stated in CPSC's market survey, a comparison of Nested Bean's product weight and the market scan revealed that Nested Bean's products fell in the 25th-55th percentile for total weight among the 108 product samples considered. Notably, Nested Bean's products were much lighter than many of the products that, although not labeled or marketed as "weighted," contained filling meant to add warmth that added significant weight to the base product.

177.    Trumka's statements lacked specificity about the definition or characteristics of these so called "weighted" products. Trumka ignored the data presented by CPSC's own staff about physical characteristics of surveyed products regardless of how they were marketed. In doing so, Commissioner Trumka's statements were doubly inaccurate and misleading because the CPSC has not defined the category of "weighted," leaving the public and retailers to identify the product based on an undefined marketing term. As a result of these failures, a false belief that Nested Bean's products were hazardous and have caused multiple infant deaths took root and was propagated by the media. But Nested Bean's products—though among the lightest weighted—were arbitrarily identified as part of an undefined "weighted" category based solely on marketing labels, rather than on verified physical characteristics or safety hazard data.

*After Trumka's Amendment is Rejected,*
*He Causes or Directs the CPSC to Change Its Safe to Sleep Guidelines*

---

[37] Exhibit 20, Nov. 16, 2023 Letter from CPSC to ASTM F15.19 Subcommittee.

178.    At some point after the CPSC's November 8, 2023 meeting, where Trumka's proposed amendment to regulate weighted infant sleep products was rejected by every other Commissioner, the CPSC modified its Safe to Sleep guidelines to recommend that the public not use "weighted" infant blankets and swaddles.[38]

179.    These guidelines, which remain on the CPSC's website, state—in bold—"**Don't use weighted blankets or weighted swaddles\***." *Id.* Then, with a footnote, the CPSC deflects responsibility by adding the caveat that "\*This guidance is based on information from the Centers for Disease Control and the National Institutes for Health. Please go to CDC.gov and NIH.gov for more information." *Id.*

180.    In other words, consistent with then-Chair Hoehn-Saric's statement at the Commission's November 8, 2023, meeting, the CPSC admitted that it had not conducted its own research or made its own determinations as to the safety of these products, and simply relied on information published by the CDC and NIH.

181.    CDC and NIH, in turn, relied on the AAP's recommendations, which rejected the only available scientific evidence (which showed that weighted products were **safe**) and cited **no scientific evidence** that weighted products were unsafe.

182.    On information and belief, this change to the CPSC's webpage was caused or directed by Trumka without any vote of the CPSC, any advance public notice or comment, and without properly following CPSC's own clearance procedures for such public statements. The CPSC itself contends this change to the website was not agency action.

### *Trumka's Vendetta Against Nested Bean*

---

[38] Exhibit 21, CPSC Safe Sleep – Cribs and Infant Products, available at https://www.cpsc.gov/SafeSleep.

183.    Disregarding the lack of voluntary or mandatory standards; the lack of product category definitions; the lack of a product ban, stop sale, or recall; and the CPSC's determination that it lacked the necessary data to propose a mandatory standard on "weighted" infant sleepwear in fiscal year 2024, Commissioner Trumka chose to pursue a methodical negative publicity campaign against "weighted" infant sleep products including Nested Bean's through public statements, national media interviews, social media posts, and ultimately letters to retailers.

184.    On January 22, 2024, Commissioner Trumka sent Nested Bean a letter requesting exhaustive information about its product, quality control, safety research, health incidents, and safety messaging compliance. He demanded a response within two weeks—February 5, 2024.[39]

185.    Nowhere in his letter did Commissioner Trumka inform Nested Bean that he was going to publicize statements about Nested Bean, the purported category of "weighted" infant sleep products, or the safety of these types of products.

186.    But before Nested Bean could respond, and only four days after sending the letter, Trumka posted an article on his official CPSC social media account that explicitly named Nested Bean.

187.    Trumka knew that any public comments he made as a CPSC Commissioner could garner enormous publicity. Capturing the public's attention was precisely his goal, as demonstrated by the many false, misleading, and disparaging public statements and social media posts (often with videos) that Trumka published about weighted infant products (including Nested Bean's) and other products such as gas stoves. Trumka had a pattern of using his bully pulpit to try to enhance his own profile and circumvent the CPSC legal rulemaking process to

---

[39] Exhibit 22, Jan. 22, 2024 Letter from Trumka to Nested Bean.

unilaterally and illegally effect the policies (including product bans) that he alone believed CPSC should pursue.

***Commissioner Trumka's January 26, 2024 Statements About Nested Bean's Products***

188.    On January 26, 2024, Commissioner Trumka used his official CPSC X account (formerly Twitter)—@TrumkaCPSC—to post[40] a link to a Washington Post article naming Nested Bean explicitly in the second sentence.[41]

189.    Trumka's post claimed that CPSC is "in agreement" with CDC, NIH, and the American Academy of Pediatrics that "weighted" infant sleep products "pose serious threats to the lives of babies" and warned the public: "Do NOT use them for sleep." [42] A true and correct copy of the post is reproduced below:

---

[40] @TrumkaCPSC, X.com (Jan. 26, 2024 at 11:00 AM), https://perma.cc/XQ9Z-NCJB.

[41] Exhibit 23, Lauren Kirchner, *Weighted blankets are dangerous for babies, doctors warn*, Washington Post, (Jan. 22, 2024), available at https://www.washingtonpost.com/wellness/2024/01/22/weighted-baby-blankets-unsafe/ (Kirchner Article).

[42] @TrumkaCPSC, X.com (Jan. 26, 2024 at 11:00 AM), https://perma.cc/XQ9Z-NCJB.



190.    The Washington Post article that Trumka linked to in the post identified Nested

Bean in the second sentence of the article:[43]



Weighted blankets have become popular with adults suffering from insomnia or anxiety, who say the product's comforting pressure makes sleep come more easily.

Get concise answers to your questions. Try Ask The Post AI.

But some companies, including Nested Bean and Dreamland Baby, are now marketing weighted sleep products — including wearable blankets and swaddles — for babies, even newborns. That's raising alarm among pediatricians and many product safety experts, including those at Consumer Reports, who say that these products are being sold with no safety standards in place and little to no evidence that they're safe.

---

[43] Exhibit 23, Kirchner Article.

191.    Trumka therefore explicitly linked Nested Bean to his statement that its products "pose serious threats to the lives of babies" and his directive to consumers: "Do NOT use them [i.e., Nested Bean's products] for sleep." Any reasonable reader of Trumka's post would understand that his statements were about Nested Bean.

192.    Nested Bean was not provided any advance notice of these statements nor an opportunity to respond to them before they were published.

### Nested Bean's February 16, 2024 Letter to Trumka—Which He Ignored

193.    On February 16, 2024, Nested Bean responded to Trumka's January 22, 2024 letter, explaining Nested Bean's safety record, product-development research, and involvement in the ASTM voluntary standards process. The CPSC already had most if not all of this information because Nested Bean had supplied it to CPSC Commissioners and staffers in April to July 2023.[44]

194.    Nested Bean's thorough response to Trumka included three empirical studies it used for its product design and stated Nested Bean's ongoing willingness to share information about its products and meet with Commissioner Trumka as an important stakeholder.

195.    Nested Bean had already provided this information to CPSC technical staff and three other CPSC Commissioners between April and July 2023.

196.    Trumka ignored it and continued his crusade against Nested Bean.

### Commissioner Trumka's April 15, 2024 Letters to Nested Bean's Retailers

197.    On April 15, 2024, ignoring Nested Bean's offer to meet, Commissioner Trumka sent nearly identical letters on his official CPSC letterhead to several major retailers, including Target, Walmart, Nordstrom, and Babylist, to exert pressure against those retailers to get them to

---

[44] Exhibit 24, Feb. 16. 2024 letter from N. Cohen to Trumka.

stop selling Nested Bean's (and other manufacturer's) products. *See* Exhibits 25 through 28, April 15, 2024 Trumka Letters to Retailers.

198.    At the time these letters were sent, Nested Bean's products were sold at Babylist, Target Online, and in over 1,200 Target stores. Nested Bean was also in negotiations with Walmart Online about carrying Nested Bean's products.

199.    In these letters, Trumka included hyperlinks to searches for weighted infant sleep products offered for sale at each retailer, which on information and belief, identified Nested Bean's products for the retailers that sold Nested Bean's products (including Babylist, Target Online, and Target stores).

200.    Trumka's letters also linked to the Washington Post article that mentioned Nested Bean's products.

201.    On information and belief, Trumka knew and intended that readers of these letters would identify Nested Bean's products and stop selling Nested Bean's products. That was his goal. And reasonable readers of Trumka's letters to retailers understood Trumka's statements to be about Nested Bean.

202.    Trumka's letter included a number of false and/or misleading statements that Trumka either knew to be false or recklessly disregarded their truth or falsity:

   a. Trumka stated that weighted infant sleep products posed "**serious safety concerns**" and there was "a **consensus** among public health agencies [CPSC, NIH, and CDC], pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are **not safe** for infant sleep. . . . **Three federal public health agencies [including CPSC]** and the [AAP] . . . have **issued warnings** recommending against the use of weighted infant blankets and wearables." *See* Exhibits 25 through 28, April 15, 2024 Trumka Letters to Retailers (emphases added).

   b. Trumka also wrote: "I am aware of **multiple infant deaths** involving weighted infant sleep sacks." *Id.* (emphasis in original).

c. Trumka included a statement he attributed to the AAP that "[t]hese products are associated with **concerning reductions in oxygen saturation levels** in infants," which he claimed "means there is **evidence that the use of weight[ed] sleep products on infants can lead to lower oxygen levels**, which if sustained, may be **harmful to the developing infant's brain**." *Id.*

d. Trumka's letter **suggested a causal link between weighted infant sleep products such as Nested Bean's and SIDS**. *Id.*

203.    These statements and implications were false or misleading because, as Trumka knew or recklessly disregarded when he wrote the letters: (1) the CPSC had not reached a consensus definition of what constitutes "weighted infant sleep products" and their characteristics based on hazard pattern; (2) the CPSC had not determined that weighted infant products including Nested Beans were "not safe" (indeed, Trumka's proposed rulemaking was rejected (for lack of sufficient data) by every other Commissioner who voted); (3) there was no "consensus" view led and agreed upon by the government entities—CPSC, NIH, and CDC simply relied on the AAP's unscientific and unsupported recommendation against weighted products; and (4) on information and belief, Trumka instrumental in directing the issuance of the warning from CPSC—it was not a Commission-wide directive or warning.

204.    Trumka also knew or recklessly disregarded that Nested Bean's own preliminary study in 2023 found that the oxygen saturation and pulse rate at a load of 30 grams (applied over the chest across an area of 10.6 square inches) were within allowable healthy ranges. He knew this because this data had been provided to CPSC staff and Commissioners multiple times between April and July 2023 and to Trumka himself in February 2024. In other words, Trumka knowingly or recklessly disregarded evidence—indisputably in CPSC's and his own possession—that Nested Bean's products did not cause "concerning reductions in oxygen saturation levels."

205. Further, Trumka knew or recklessly disregarded when he wrote the letters that no formal safety determination had been made by the CPSC or any other governmental authority about weighted infant sleep products like Nested Bean's—indeed no definition of "weighted" infant sleep products had been promulgated or agreed upon.

206. Trumka also knew or recklessly disregarded that there was no data or regulatory finding substantiating any claims of product danger and no data supporting the implication that Nested Bean's products specifically caused any infant deaths, therefore did not post an "unreasonable risk" of injury or death. But he connected Nested Bean's products to the statements in these letters anyway.

207. After knowingly or recklessly making all of these false statements, Trumka concluded his letters by writing: "Considering these serious safety concerns, I would like to speak with a representative of your company to discuss a simple question: does [Target / Walmart / Nordstrom / Babylist] really want to continue selling these products to its consumers?" He then invited each company to schedule a telephone call with him at their earliest convenience. *See* Exhibits 25 through 28, April 15, 2024 Trumka Letters to Retailers.

208. The letters did not disclose that CPSC voted 3-1 against regulating these products, or that the only cited research was by a non-governmental agency, which showed no evidence of harm or hazard pattern (and if anything showed that "weighted blankets may be beneficial"). Trumka was aware of all these facts and chose not to disclose them. *See id.*

209. Trumka knew that his "question" would not be perceived as a question or an invitation for a discussion, but as a threat of regulatory action if these major retailers did not pull the weighted infant products from their shelves—notwithstanding that CPSC had voted down 3-1 Trumka's proposal to regulate the products.

51

210.    At least one retailer (Target) interpreted Trumka's letter as an official demand that required a response. Indeed, CPSC records from this period (described below) show multiple calls between Trumka's office and Target after they received his letter. The notes of one of those calls states that Trumka and his staff "spoke with a representative of Target to discuss **the timeline in which Target can officially respond** to Commissioner Trumka's letter regarding weighted infant products."[45] Of course, Trumka had no legal authority to compel any retailer to sit for an inquiry before him or even to respond to his letters. But retailers interpreted his misleading letters as compelling just that and more.

211.    That was precisely the point: Trumka was attempting unilaterally and illegally to ban Nested Bean's products along with other weighted infant products, even though he knew that CPSC made no findings about the safety of weighted infant sleep products like Nested Bean's and in fact voted against regulating them given the lack of research or evidence to do so.

212.    Nested Bean was not provided any advance notice of these letters nor an opportunity to respond to them before they were published.

### *Trumka's April 15, 2024 Written Statement*

213.    Trumka didn't stop with the letter. That same day, he put out a public statement, on the official CPSC website and on CPSC letterhead, titled: "BEWARE: WEIGHTED INFANT SWADDLES AND BLANKETS ARE UNSAFE FOR SLEEP; RETAILERS SHOULD CONSIDER STOPPING SALES."[46] That statement was posted to the CPSC website along with a link to Trumka's X post described below.[47]

---

[45] Exhibit 29, Log of April 22, 2024 Meeting, Office of Commissioner Trumka, https://tinyurl.com/bdzur24r (emphasis added).
[46] Exhibit 30, April 15, 2024 Statement of Trumka.
[47] *See* Exhibit 30, April 15, 2024 Statement by Trumka, available at https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Beware-Weighted-Infant-Swaddles-and-Blankets-Are-Unsafe-for-Sleep-Retailers-Should-Consider-Stopping-Sales.

214. That public statement included many of the same knowingly or recklessly false and misleading statements that Trumka sent to the retailers themselves:

    a. "CPSC has a clear warning for safe infant sleep: 'Don't use weighted blankets or weighted swaddles' for your babies."

    b. "CPSC, NIH, CDC, and AAP have all warned the public not to use weighted swaddles and blankets." *Id.*

    c. "There are multiple infant deaths in these products[,]" relying upon the Washington Post article that identifies Nested Bean to falsely and misleadingly associate Nested Bean's products with this grave false and misleading claim. *Id.*

215. Those statements are false and misleading for the reasons set forth above concerning the letters to retailers.

216. Critically, Trumka said the quiet part out loud about his attempted one-man ban in his April 15 statement:

> Last fall, **I tried to amend CPSC's operating plan** to start work on a **rule to protect babies from weighted products**, but was **unable to garner the necessary support** at that time.
>
> But **we do not have to wait** *for a federal rule* **to start protecting babies**. **Retailers** could take precautions today—they **have the power to stop sales**. In the interest of public safety, **I've asked retailers nationwide** to reflect on this question: with all the advice out there cautioning against their use, **are weighted infant swaddles really what you want to be selling to your consumers? I expect many responsible retailers, armed with this knowledge, will say "no." Stay tuned for those decisions.**

*Id.* (bold emphasis added; italics in original).

217. Trumka made these statements on CPSC letterhead, the CPSC website, and his official CPSC X account, falsely and misleadingly giving the statements the imprimatur of coming from the CPSC, even though it had rejected his proposal. However, Trumka signed the statement as "Your consumer advocate at the [CPSC]."

218. In other words, Trumka admitted that he was trying to circumvent the CPSC's lawful rulemaking process and unilaterally ban weighted infant sleep products including Nested

Bean's, while giving his statements the misleading imprimatur of coming from the CPSC. That was a misrepresentation of his authority, a misrepresentation there was scientific data supporting his opinions and beliefs when there wasn't, and a misrepresentation of a consensus that did not exist.

219.    Specifically, Trumka stated that his goal was to pressure retailers to stop selling these products—an admission that Trumka was trying to implement an illegal one-man ban of weighted infant sleep products including Nested Bean's.

220.    Nested Bean was not provided any advance notice of these statements nor an opportunity to respond to them before they were published.

### *Trumka's April 15, 2024 Statement and Video Posted to X and Instagram*

221.    Trumka was busy on April 15, 2024. In addition to the letters and the statement, he posted a video on his official CPSC X account[48] and on his official CPSC Instagram account,[49] each with a caption stating "Do NOT – I repeat – do NOT put any weighted swaddles or blankets on your baby. Companies will try to fool you into thinking they're safe, but there's a reason @USCPSC, @CDC, & @NIH have warned you NOT to use them. It's a risk of death to your baby." *Id.*

222.    The video included an intentionally and misleadingly dramatized photo showing a baby in a sleep sack with metal dumbbells on its chest, clearly intended to cause viewers to believe the weight on an infant's chest from these products must be extremely heavy. Screenshots of the April 15, 2024, posts on X and Instagram are reproduced below:

---

[48] @TrumkaCPSC, X.com (Apr. 15, 2024 at 3:16 PM), https://perma.cc/G86U-C3ZY.

[49] @trumkacpsc, Instagram.com (Apr. 15, 2024), https://perma.cc/MM4F-ZL8V.




223. In the videos Trumka knowingly or recklessly repeats some of the same false and misleading statements:

> It seems like a new baby product comes on the market every day. Some new ones that you need to watch out for are **weighted infant swaddles and blankets**. Weighted blankets for adults are one thing, but they **have no place in infant sleep**. **The Consumer Product Safety Commission just updated our safe sleep guidance to warn you NOT to use these products with your babies**. This brings us in line with NIH and with CDC which warns that **weighted products are unsafe for infants**. And when unsafe comes up in the infant sleep space, let's be clear we're talking about the **risk of death**. You can find our safe sleep guidance at cpsc.gov/safesleep. It has great information on what to do and what not to do.

*Id.* (emphases added).

224. Nested Bean was not provided any advance notice of these statements nor an opportunity to respond to them before they were published. They are false and misleading for the same reasons alleged above.

***Trumka's Attempted One-Man Ban Begins to Impact Nested Bean's Retailers***

55

225.    Each of Nested Bean's retailers that received one of Trumka's letters to retailers stopped their sales of Nested Bean's products within days of receiving the letters. Presumably this was done out of fear of being investigated or sanctioned by the CPSC.

226.    On April 19, 2024, representatives from Target emailed Nested Bean in response to "the new CPSC warning that was issued about weighted swaddles this week," expressly referencing Commissioner Trumka's April 15th statement by hyperlink.[50]

227.    They asked Nested Bean to meet with Target's general counsel, compliance, and safety/quality/regulatory partners to discuss the safety of Nested Bean's products "based on" Commissioner Trumka's statement. *Id.*

228.    On April 22, 23, and 25, 2024, Commissioner Trumka spoke with Target representatives multiple times to discuss Target's response to his April 15th letter recommending Target stop the sale of "weighted" infant sleep products.[51]

229.    On April 25, 2024, after a Zoom meeting with Nested Bean, Target informed Nested Bean that "after much internal review" it would no longer sell any of Nested Bean's products, and that the products would "be removed from our stores and online by the end of the week."

230.    Before Trumka's April 15 letter, Nested Bean had just been awarded in March 2024 an expanded footprint across over 1,200 Target stores nationwide, after years of working successfully with the major retailer in about 400 stores. Nested Bean was poised to dramatically increase its sales at Target, and Nested Bean therefore increased its inventory count to support the Target national launch in March 2024.

---

[50] Exhibit 31, April 19, 2024 Email from Target to Nested Bean.
[51] Exhibit 29, Log of April 22, 2024 Meeting, Office of Commissioner Trumka, https://tinyurl.com/bdzur24r; Exhibit 32, Log of April 23, 2024 Meeting, https://tinyurl.com/5hdhnmyu; Exhibit 33, Log of April 25, 2024 Meeting, https://tinyurl.com/39z236vz.

231.     But, after reading Trumka's false and misleading statements, Target removed all Nested Bean inventory from over 1,200 of its stores—less than one week after Trumka put out his false and misleading statements—and subsequently returned the inventory to Nested Bean. Trumka's letters rendered the massive increase in inventory that Nested Bean invested in virtually useless and a near complete loss. For the fastest execution, this major retailer had to trigger a recall protocol. As a result, Target customers who tried to purchase the products in store were informed at checkout that the product was being "recalled," even though the CPSC had not issued a recall, ban, or stop-sale order on any of Nested Bean products.

232.     On April 19, 2024, an Amazon Seller Success Team representative had a telephone call with Nested Bean's Manasi Gangan to notify Nested Bean of Amazon's new policy prohibiting weighted infant sleep products,[52] and Amazon's intent to stop sales of Nested Bean's products in one week. Ms. Gangan informed Amazon that doing that could drive Nested Bean into bankruptcy.

233.     By April 23, 2024, Amazon too stopped sales of all Nested Bean products and notified customers who had purchased Nested Bean products in the past twelve months that CPSC had "warned that these products should not be considered safe for use by children and babies." One such email is reproduced below:

---

[52] Exhibit 34, Amazon Seller Central, Weighted Infant and Toddler Sleep Products, available at https://sellercentral.amazon.com/help/hub/reference/external/GKDFVJSUHPYTRHW3#mnd_2jc_jcb__section_g31_mbb_jxb.



----------- Forwarded message -----------
From: **Amazon Product Safety Team** <order-update@amazon.com>
Date: Tue, Apr 23, 2024 at 10:39AM
Subject: Attention: Important safety notice about your past Amazon order

amazon

Dear Amazon Customer,

Our records indicate that you purchased a weighted infant sleep product from us in the last 12 months.

Affected Product: B09JKYSDJG - Nested Bean Zen One◆ | Infant Swaddle | Babies 0-3M (7-13 Lbs) | Adapts for Arms in/Out | Prevents Startles | Aids Self-Regulation | 2-Way Zipper | TOG 1.0 | Machine Washable
Order ID: 114-3029808-5010654

The American Academy of Pediatrics (AAP) and Consumer Protection and Safety Commission (CPSC) have warned that these products should not be considered safe for use by children and babies. You can find more information on safe infant sleep in this CPSC alert: https://www.cpsc.gov/SafeSleep.

If you still have any of these products, we recommend you stop using these products for children and infants under three years old. If you purchased this item for someone else, please notify the recipient immediately and provide them with the information contained within this message.

Please contact Amazon Customer Service if you have any additional questions.

The safety and satisfaction of our customers is our highest priority. We regret any inconvenience this may cause you.

Thanks for shopping at Amazon.

Sincerely,
Customer Service
Amazon.com
www.amazon.com

Please note: this e-mail was sent from a notification-only address that cannot accept incoming e-mail. Please do not reply to this message.

©2024 Amazon.com, Inc. or its affiliates. Amazon and all related marks are trademarks of Amazon.com, Inc. or its affiliates, Amazon.com, Inc. 410 Terry Avenue N., Seattle, WA 98109.

234.    That same day, Amazon customers started contacting Nested Bean's customer support demanding refunds.

235. Amazon destroyed some of the Nested Bean inventory that it had. Amazon returned some of the other products to Nested Bean, but to date has yet to fully refund the charges associated with the take down and return.

236. On April 26, 2024, Amazon started taking down all Nested Bean listings, which was completed the following week. A competitor's products (Dreamland Baby) were also taken down during that time, but counterfeit Dreamland Baby products remained for sale on Amazon for almost a month before they were removed.

237. Before Amazon pulled Nested Bean's products, Nested Bean had been a top seller on Amazon. In 2022, Nested Bean's most popular product, the Zen Sack®, frequently ranked in the top 3 positions for that product category on Amazon. Nested Bean's second most popular product, the Zen One™, ranked in the top 10 positions in that product category on Amazon. In 2023, the company was frequently in the top 10 of its product category on Amazon and in 2024, before Amazon delisted Nested Bean's products, the company's products were still among the highly searched and purchased products.

238. Unsurprisingly, customer complaints and refund requests followed. Many of the customer messages that Nested Bean received demonstrated that customers had been misled to believe that the AAP, CPSC, and other government agencies had concluded that weighted infant sleep products were not safe. Many customers also believed that Nested Bean's products had been recalled or even banned. Returns and refund requests immediately increased as a result, and Nested Bean's sales still have not recovered.

239. In short, retailers and customers were misled by Trumka's letter and communications into believing that the CPSC had made a product safety determination regarding "weighted" infant sleep products when the CPSC had made no such determination and, in fact,

59

when the CPSC admittedly lacked data or evidence supporting such an action and expressly

voted **against** regulating products like Nested Bean's.

### *Commissioner Trumka Gloats About Stopping the Sale of Nested Bean's Products*

240.    On April 26, 2024, Trumka put out a statement on the CPSC website,[53] his official

CPSC X account,[54] and his official CPSC Instagram account,[55] gloating about the harm he

inflicted on Nested Bean's business through his illegal one-man ban.

241.    Trumka repeated several of the same false and misleading statements summarized

above, as well as others.

242.    For example, he wrote: "I've sat with the parents of a child who died in one of

these products," like Nested Bean's, without disclosing that the tragic death of the infant in

question was demonstrably not caused by weighted infant sleep products, but by other unsafe

conditions in the infant's sleep environment, including the use of a sleep lounger of the type that

CPSC later banned. *Id*.

243.    He also wrote:

> On April 15, 2024, **I wrote to major U.S. retailers** informing them of the
> **hazards** weighted infant swaddles and blankets pose to babies and **asking them
> to consider whether they want to continue selling such products**. **I am pleased
> to announce that Target, Walmart, Nordstrom, and Babylist quickly
> responded by sharing that they will cease sales of weighted infant products** in
> the interests of safety. . . . **I have observed other major companies like Amazon
> begin to follow their example**, **sending out notices to consumers that they will
> no longer be allowing sellers to list these types of products on their platforms**.
> **I expect to hear back from additional retailers soon**.

*Id*. (emphases added)

---

[53] Exhibit 35, Comm'r Richard Trumka, *Target, Walmart, Nordstrom, and Babylist Commit to Stop Selling Weighted Infant Products*, (Apr. 26, 2024), https://tinyurl.com/bdz3tyvn.

[54] @TrumkaCPSC, X.com (Apr. 26, 2024 at 10:26 AM), https://perma.cc/4CGR-8VWB.

[55] @trumkacpsc, Instagram.com (Apr. 26, 2024), https://perma.cc/EL23-JDLV.

244. Trumka thereby admitted again that his purpose in sending the letters to these retailers was to implement a one-man ban of weighted infant sleep products including Nested Bean's, notwithstanding CPSC's considered judgment not to regulate those products.

245. Screenshots of Trumka's X and Instagram posts, bragging that "[a]fter receiving my letters, @Target, @Nordstrom, @Walmart and @Babylist have agreed to discontinue the sale of weighted infant sleep sacks," are reproduced below:



246.    In his video, Trumka again repeats some of the same false and misleading statements identified above and continues to gloat about his illegal one-man ban:

> I've got some great news to report. Last week, **I wrote to major U.S. retailers and I wanted to talk to them about a product category that I'm concerned about**: **Weighted infant blankets and swaddles**. I wanted to let them know that **CPSC, CDC, NIH, and the American Academy of Pediatrics have all warned against their use** and that **multiple deaths have occurred in these products**. Armed with this information, **multiple major U.S. retailers decided to stop selling these products** out of an abundance of caution and a mind toward safety. And **I wanted to take time to commend those companies. Target, Walmart, Nordstrom, and Babylist all made the decision to pull sales of these products. I have letters out to other retailers as well**; I haven't heard back from them quite yet. I'm gonna report to you when I do. Stay safe.

*Id.* (emphases added).

247.    Nested Bean was not provided any advance notice of these statements nor an opportunity to respond to them before they were published.

248.    Trumka bragged again about his one-man ban on weighted infant sleep products including Nested Bean's during testimony before Congress on July 23, 2024: "[Retailers] stopped selling product categories like . . . weighted infant swaddles, when they learned of CPSC

warnings for consumers not to use them."[56] Trumka continued to double down, even when there was no CPSC consensus—only Trumka's evidence-free and anti-science crusade.

### *Due Process Violation*

249.    Nested Bean was not provided notice of any of Trumka's false, misleading, and disparaging statements before they were made public, let alone an opportunity to respond, comment, or be heard in any way, even though the statements allow the public to readily ascertain Nested Bean's identity.

250.    Additionally, Trumka's statements and actions toward Nested Bean convey an actual bias toward Nested Bean and weighted infant sleep products generally. As such, Trumka's statements and actions were made with impermissible bias and by a person who was and is incapable of neutral unbiased actions in violation of Nested Bean's rights to due process of law.

### *Nested Bean Asks Trumka to Correct the Record*

251.    On May 22, 2024, Nested Bean wrote to Commissioner Trumka and asked him to correct the record regarding his attacks on the company and to issue an immediate retraction of his inaccurate and misleading statements.[57]

252.    On July 22, 2024, Commissioner Trumka refused and claimed that they were his personal statements, even though they were made from his official letterhead, on his official social media accounts, and posted to the CPSC website without any "personal statement" disclaimer.[58]

---

[56] Exhibit 36, Testimony of Commissioner Richard L. Trumka Jr., United States CPSC, Hearing on "The Fiscal Year 2025 CPSC Budget" U.S. House of Representatives Committee on Energy & Commerce; Subcommittee on Innovation, Data & Commerce, available at https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Testimony/Testimony-of-Commissioner-Richard-L-Trumka-Jr-United-States-CPSC-Hearing-on-%E2%80%9CThe-Fiscal-Year-2025-CPSC-Budget%E2%80%9D-US-House-of-Representatives-Committee-on-Energy-Commerce-Subcommittee-on-Innovation-Data.

[57] Exhibit 37, May 22, 2024 Letter from Nested Bean to Trumka.

[58] Exhibit 38, July 22, 2024 Letter from Trumka to Nested Bean.

253.    Trumka tried to shirk his statutory responsibilities by relying on the equally unsupported statements of other health agencies that are not tasked with product safety and claiming that he merely echoed the warnings of CPSC in his "personal" statements, even though those "CPSC" warnings, on information and belief, were published to CPSC's website at Trumka's insistence.

254.    On August 1, 2024, Nested Bean again wrote to Commissioner Trumka and demanded that he immediately retract the inaccurate and misleading statements.[59]

255.    Nested Bean's letter provided evidence that his false and misleading letters to retailers, which cited the Washington Post article that expressly named Nested Bean, caused most retailers to stop selling their products. Retailers continued to sell "weighted" sleep products from manufacturers that Trumka did *not* name through his official CPSC platforms. *See* example below:



---

[59] Exhibit 39, Aug. 1, 2024 Letter from Nested Bean to Trumka.

256.    Trumka's August 16, 2024 response ignored Nested Bean's retraction request.[60]

### *Nested Bean Seeks Retraction of CPSC and Trumka's Statements*

257.    On November 11, 2024, counsel for Nested Bean sent a letter to the Secretary of the Commission seeking a retraction of the inaccurate and misleading statements by Commissioner Trumka and the CPSC itself under 15 U.S.C. § 2055(b)(7) ("Retraction Request").[61]

258.    The Retraction Request asked the CPSC to publicly retract (a) Commissioner Trumka's inaccurate and misleading statements, as detailed *supra*, and (b) the CPSC's Safe to Sleep recommendation against the use of "weighted" infant sleep products. *Id.* The Retraction Request provided in detail the legal and factual bases for the request. *Id.*

259.    Around December 19, 2024, the Commission voted on Nested Bean's request for retraction.[62] The outcome of the vote was 0-1-1-2, with zero commissioners voting for the retraction, one and one representing separately proposed courses of action, and two representing abstentions. *Id.* Commissioner Trumka recused himself from the vote. *Id.* Chairman Hoehn-Saric proposed delaying a response for ninety days to allow the CPSC more time to consider all the facts and circumstances. *Id.* Commissioner Boyle proposed (1) sending a letter to retailers clarifying that the Commission has not taken any official action and that Commissioner Trumka's statements were not made on behalf of the CPSC and do not constitute a stop sale, ban, or recall; and (2) directing the CPSC staff to review the Safe to Sleep guidance in light of new information since its posting in 2023. *Id.* Commissioners Feldman and Dziak abstained from the

---

[60] Exhibit 40, Aug. 16, 2024 Letter from Trumka to Nested Bean
[61] Exhibit 41, Demand Letter to the Consumer Product Safety Commission on Behalf of Nested Bean, Liberty Justice Center, https://libertyjusticecenter.org/other-legal-work/demand-letter-to-cpsc-on-behalf-of-nested-bean/ (Nested Bean's November 11, 2024 Letter to CPSC).
[62] Exhibit 42, Record of CPSC Vote on Request by Nested Bean for Retraction, available at https://tinyurl.com/4v2mmtht.

vote and issued a joint statement suggesting that Nested Bean's relief is "best obtained through an Article III court." The CPSC itself contends this vote was not agency action.

260.    Sometime between August 28, 2025, and September 2, 2025, the Safe to Sleep guidelines that recommended against using "weighted" infant products were inexplicably removed from the CPSC's website. The reproduced webpage below with those guidelines removed is produced below:



261.    Then, as quickly and inexplicably as the recommendation against "weighted" products disappeared, the recommendation reappeared on the CPSC website on or about September 5, 2025, and remains on the website as of the date of the filing of this Complaint.

262.    The harm to Nested Bean is ongoing because Trumka's statements and the Safe to Sleep guidelines remain posted on the CPSC's website (although Trumka's official X and Instagram accounts appear to have been deactivated), and because neither Trumka nor the CPSC has retracted or corrected the statements.

### *Congressional Investigation Into Trumka's Pattern of Abusing His Power*

263.    On July 25, 2024, the Chairman of the House Committee on Small Business announced that the Committee was launching an investigation into Trumka's unilateral actions and abuse of power, specifically pertaining to the very actions for which Nested Bean is seeking redress in this lawsuit.[63]

264.    The Committee Chairman explained that the Committee was investigating "Trumka's unilateral actions," which could be unlawful, and which "have caused immense harm to small businesses by publicly encouraging retailers to stop selling the business' products." *Id*. Chairman Roger Williams also pointed out that "Trumka used the CPSC's official letterhead— giving an appearance of presenting the CPSC's views." *Id*. That appearance was false and misleading.

265.    Chairman Williams noted that "Trumka publicly disclosed information about the manufacturers' identity" in both his public statements and letters to retailers by citing a "Washington Post article [that] clearly names Dreamland and Nested Bean as manufacturers of the alleged dangerous weighted blankets." *Id*. "These two businesses were singled out in the article and mentioned multiple times by name." *Id*.

266.    Importantly, Chairman Williams observed that Trumka "failed to take 'reasonable steps,'" as required by the CPSC's organic statute, to assure that the information he disclosed

---

[63] Exhibit 43, Congressional Small Business Committee letter to CPSC Chairman, dated July 25, 2024, https://perma.cc/NVR2-MNHW.

about Nested Bean was: (1) accurate; (2) fair in the circumstances; and (3) reasonably related to effectuating the purposes of the laws administered by the CPSC. *Id*. Trumka also failed to give Nested Bean an opportunity to comment on the accuracy of the information **before** it was disclosed. *Id*.

267.    Chairman Williams pointed out that Trumka: (1) "failed to ensure the information [was] accurate"; (2) made allegations not supported by scientific research (including that Trumka was "aware of multiple infant deaths" involving weighted infant sleep products); and (3) directly contradicted the CPSC's judgment not to regulate these products, meaning the disclosures were not "reasonably related to effectuating the purposes of the" Consumer Product Safety Act." The Chairman concluded that "Trumka did not establish 'procedures designed to ensure that such information is accurate and not misleading.'" *Id*.

268.    Chairman Williams then noted that "there is no actual data or evidence that [CPSC, CDC, NIH, or AAP] are using when alleging that weighted sleep products are dangerous." *Id*. Indeed, the AAP (which was the source of the recommendation against using weighted infant sleep products) did not state "facts" but only "beliefs" in its letter to the CPSC, and the AAP itself pointed out the "lack of substantial evidence about the possible harms of weighted sleep products." *Id*.

269.    The Chairman then explained that the House Committee's investigation stemmed from a pattern of unilateral actions by Trumka where he unilaterally issued public statements about a product under the guise of official CPSC authority.[64] For example, in January 2023,

---

[64] Exhibit 44, Zack Halaschak, *GOP panel accuses safety commission's Richard Trumka Jr. of pressuring private businesses*, Washington Examiner (July 25, 2024), https://www.washingtonexaminer.com/news/business/3098110/gop-panel-accuses-safety-commissions-trumka-jr-pressuring-private-businesses/#google%20vignette.

Trumka announced to the world that the CPSC intended to ban gas stoves.[65] As in Nested Bean's case, in which Trumka ignored the CPSC's decision not to initiate a rulemaking for "weighted" products, Trumka followed the CPSC's decision against proposed gas-stove standards (where no Commissioner supported Trumka's proposal) with a one-man media campaign.[66] Trumka's false statement that CPSC would ban gas stoves was so inaccurate and misleading, and caused such a public backlash, that the Chairman for the CPSC (who, like Trumka, was nominated by President Biden) and the Biden White House felt it necessary to issue their own statements clarifying that the CPSC had no intention to ban gas stoves. *Id.*

270.    Chairman Williams explained that the Committee was "concerned that a single CPSC Commissioner [was] exerting undue pressure on entities and forcing them to improperly remove small business' products from their shelves to the detriment of those small businesses," including Nested Bean. *Id*.

271.    Perhaps it should come as no surprise then that President Trump removed Trumka from the CPSC on May 8, 2025.[67]

272.    However, the CPSC itself has made two things clear: (1) Trumka was acting within the scope his office or employment as a CPSC Commissioner when he made the statements at issue; and (2) Trumka's actions do not constitute agency action by the CPSC:

---

[65] Exhibit 45, Breanne Deppisch, *Gas stove ban not in the works, agency chairman says amid uproar*, Washington Examiner (Jan. 11, 2023) https://www.washingtonexaminer.com/news/405289/gas-stove-ban-not-in-the-works-agency-chairman-says-amid-uproar/.

[66] Exhibit 46, Breanne Deppisch, *The obscure regulator (and political scion) who sparked the furor over gas stoves*, Washington Examiner (Jan. 12, 2023) https://www.washingtonexaminer.com/news/2277854/the-obscure-regulator-and-political-scion-who-sparked-the-furor-over-gas-stoves/.

[67] *See supra* note 3 (describing status of Trumka's legal challenge to his removal).

"Commissioner Trumka's activities in this matter were **conducted in his individual capacity as a member of the Commission**, and **not on behalf of the Commission itself**."[68]

### *Harm to Nested Bean Caused by Trumka and the CPSC*

273.    CPSC's and Trumka's statements and conduct, including Trumka's one-man ban, have caused devastating harm to Nested Bean's business and reputation.

274.    Retailers and consumers were misled to believe that Nested Bean's products have caused multiple infant deaths and/or are unsafe, neither of which is true.

275.    Multiple major retailers discontinued the sale of Nested Bean products in response to Trumka's false and misleading statements. While Nested Bean has a few relationships with smaller independent retailers, the major retailers that it had been making inroads with are currently unavailable to Nested Bean as a result of Trumka and the CPSC. Target will not resume sales of Nested Bean products until the CPSC's and Trumka's statements are retracted. Amazon has not indicated any intention of relisting Nested Bean's weighted infant sleep products.

276.    Many of these retailers continued to sell other brands of infant sleep products with added weight that were not mentioned or alluded to in Trumka's letters.

277.    Nested Bean's customers were misled to believe that the AAP, CPSC, and other government agencies concluded that weighted infant sleep products were not safe. Many customers believed Nested Bean's products were recalled or even banned. Returns and refund requests immediately increased as a result, and Nested Bean's sales still have not recovered.

---

[68] Exhibit 47, Oct. 22, 2024, A. Miller, *Immigrant Business Owner Blasts "Anti-Science" Biden Admin Push that Crippled Her Sales: "Devastating"*, Fox News, available at https://www.foxnews.com/politics/immigrant-business-owner-blasts-anti-science-biden-admin-push-that-crippled-her-sales-devastating.

278. As a result, Nested Bean's sales have dropped more than 80%, and it was forced to lay off 93% of its workforce, which Nested Bean had increased to meet sales forecasts and international expansion plans.

279. This devastating decline has ruined Nested Bean's relationships in the retail industry, including several independent retailers that have followed suit and stopped carrying Nested Bean products in their stores.

280. Nested Bean's survival, and its ability to bring effective products to market to help its customers, are at grave risk. Indeed, even when Nested Bean listed unweighted products for sale on Amazon in December 2024, those unweighted products were delisted several times when the retailer apparently mistook them for weighted products. That caused disruption to Nested Bean's sales as it had to engage in additional support cycles to appeal the delisting and get the unweighted products relisted.

281. As a result, Nested Bean's business may never be able to recover fully, resulting in massive lost profits and a dramatic decrease in its enterprise value.

282. Nested Bean's losses also include, without limitation, an enormous increase in product returns, fixed costs for inventory overstock and related storage costs, expenses incurred to attempt to rehabilitate its reputation, damaged banking relationships, consulting fees, and legal fees Nested Bean had to incur to defend itself as a result of the fallout from CPSC's and Trumka's false and misleading statements and conduct.

283. These losses have prevented Nested Bean from reinvesting in growth, as it had planned to do, including a major new product rollout and international expansion that has been (and likely will permanently be) shelved.

284. Nested Bean's losses also include investments in anticipated growth that has not come to fruition as a result of Trumka's and the CPSC's conduct, including without limitation costs related to a new website design for Nested Bean's planned international growth, new enterprise resource planning software for automation and scale, office equipment to support Nested Bean's growing workforce, and email systems for automated marketing and scale.

285. In sum, the CPSC and Trumka have destroyed Nested Bean's business.

## CLAIMS FOR RELIEF[69]

### COUNT 1
### Gross Negligence

286. Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

287. Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

288. As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

289. Defendant, acting through Trumka and the CPSC, owed Nested Bean a duty of care, including without limitation, a duty arising from their obligations under the Consumer Product Safety Act, its implementing regulations, and CPSC Order No. 1450.2.

290. These provisions establish a duty and specific standards of care and conduct requiring that any public statements about the safety of a consumer product—particularly those that identify or implicate a manufacturer—must be accurate, not misleading, and made in

---

[69] Nested Bean's position is that Massachusetts law governs these tort claims under 28 U.S.C. § 1346(b)(1) and applicable state conflict of law principles, but these tort claims can be maintained under either Massachusetts or Maryland law.

accordance with mandatory procedural safeguards, including prior notice to the manufacturer and an opportunity to respond.

291.   The Consumer Product Safety Act, its regulations, and CPSC Order No. 1450.2 were enacted and promulgated to protect a class of persons that includes manufacturers like Nested Bean. These statutory and regulatory duties are specifically intended to protect manufacturers from reputational, economic, and other business harm resulting from inaccurate or misleading public statements about their products.

292.   Defendant, acting through Trumka and the CPSC, grossly negligently made false and/or misleading statements about the safety of Nested Bean's products, including without limitation in public statements and letters to retailers, and in the changes to CPSC's Safe Sleep guidance on its website, without sufficient factual basis, supporting date, or compliance with the procedural and substantive safeguards mandated by the Consumer Product Safety Act, its implementing regulations, and CPSC Order No. 1450.2.

293.   Defendant's breach of the standard of care, including through violation of these statutory and regulatory obligations, constitutes gross negligence, as the conduct breached the standard of care in a manner that demonstrated a wanton and reckless disregard for Nested Bean's rights and the foreseeable consequences of Defendant's conduct. Trumka deliberately ignored his obligations to Nested Bean and the harm that was likely to occur. He exercised no reasonable restraint, but rather engaged in a palpably negligent course of conduct from 2022 into 2024.

294.   Defendant's grossly negligent conduct was the direct and proximate cause of Nested Bean's injuries. It was not only foreseeable, but was intended, that Trumka's course of conduct would cause harm to Nested Bean. And that is exactly what happened.

295.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

296.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. § 551(13).

## COUNT 2
### Fraudulent Misrepresentation / Deceit

297.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

298.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

299.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

300.    Defendant, acting through Trumka and the CPSC, made a series of false and/or misleading representations to Nested Bean's retail partners and other retailers as well as Nested Bean's customers and potential customers.

301.     For example, as alleged above, Trumka made the following false and/or misleading statements of fact:

    a.   Trumka stated that weighted infant sleep products posed "**serious safety concerns**" and there was "a **consensus** among public health agencies [CPSC, NIH, and CDC], pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are **not safe** for infant sleep. . . . **Three federal public health agencies [including CPSC]** and the [AAP] . . . have **issued warnings** recommending against the use of weighted infant blankets and wearables."

    b.   Trumka also wrote: "I am aware of **multiple infant deaths** involving weighted infant sleep sacks." *Id*. (emphasis in original).

    c.   Trumka included a statement he attributed to the AAP that "[t]hese products are associated with **concerning reductions in oxygen saturation levels** in infants," which he claimed "means there is **evidence that the use of weight[ed] sleep products on infants can lead to lower oxygen levels**, which if sustained, may be **harmful to the developing infant's brain**."

    d.   Trumka's statements **suggested a causal link between weighted infant sleep products such as Nested Bean's and SIDS**.

302.     These statements and implications were false or misleading, as Trumka knew or recklessly disregarded when he made them, because: (1) the CPSC had not reached a consensus definition of what constitutes "weighted infant sleep products" and their characteristics based on hazard pattern; (2) the CPSC had not determined that weighted infant products including Nested Beans were "not safe" (indeed, Trumka's proposed rulemaking was rejected (for lack of sufficient data) by every other Commissioner who voted); (3) there was no "consensus" view led and agreed upon by the government entities—CPSC, NIH, and CDC simply relied on the AAP's unscientific and unsupported recommendation against weighted products; and (4) on information and belief, Trumka instrumental in directing the issuance of the warning from CPSC—it was not a Commission-wide directive or warning.

303.     Trumka also knew or recklessly disregarded that Nested Bean's own preliminary study in 2023 found that the oxygen saturation and pulse rate at a load of 30 grams (applied over

75

the chest across an area of 10.6 square inches) were within allowable healthy ranges. He knew this because this data had been provided to CPSC staff and Commissioners multiple times between April and July 2023 and to Trumka himself in February 2024. In other words, Trumka knowingly or recklessly disregarded evidence—indisputably in CPSC's and his own possession—that Nested Bean's products did not cause "concerning reductions in oxygen saturation levels."

304.    Further, Trumka knew or recklessly disregarded that no formal safety determination had been made by the CPSC or any other governmental authority about weighted infant sleep products like Nested Bean's—indeed no definition of "weighted" infant sleep products had been promulgated or agreed upon.

305.    Trumka also knew or recklessly disregarded that there was no data or regulatory finding substantiating any claims of product danger and no data supporting the implication that Nested Bean's products specifically caused any infant deaths, and therefore did not pose an "unreasonable risk" of injury or death. But he connected Nested Bean's products to his false and/or misleading statements anyway.

306.    These false and/or misleading statements were made on CPSC's official website, on official CPSC letterhead, or from Trumka's official CPSC social media accounts, and in the context of Trumka's role as a federal official, thereby falsely and misleadingly creating the appearance of government authority.

307.    When Trumka made these statements, he knew they were false and/or misleading, or at the very least acted with reckless disregard for their truth or falsity.

308.    Trumka made these false and/or misleading statements with the intent to mislead and intimidate Nested Bean's retail partners and to induce them to stop selling Nested Bean's products.

309.    Trumka similarly made these false and/or misleading statements with the intent to mislead Nested Bean's customers and potential customers to induce them to stop buying and return already purchased Nested Bean products.

310.    Trumka's statements were intended to create the false and/or misleading impression of already completed or imminent regulatory action or investigation. Trumka made the statements with the purpose of creating the false and misleading appearance of an urgent and authoritative warning, even though none existed (particularly after Trumka's failed amendment was voted down 3-1).

311.    Given Trumka's position as a CPSC Commissioner and his use of CPSC's official website, CPSC letterhead, and official social media channels, retailers and consumers reasonably relied on Trumka's representations as authoritative statements about the safety of Nested Bean's weighted infant sleep products.

312.    As a result, Nested Bean's retail partners terminated their business relationships with Nested Bean, and Nested Bean's customers stopped purchases, returned purchased products, and customers and potential customers decided not to purchase Nested Bean's products.

313.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold

inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

314.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. § 551(13).

## COUNT 3
### Negligent Misrepresentation

315.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

316.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

317.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

318.    Defendant, acting through Trumka and the CPSC, made a series of false and/or misleading representations to Nested Bean's retail partners and other retailers as well as Nested Bean's customers and potential customers.

319.    For example, as alleged above, Trumka made the following false and/or misleading statements of fact:

   a. Trumka stated that weighted infant sleep products posed "**serious safety concerns**" and there was "a **consensus** among public health agencies [CPSC, NIH, and CDC], pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are **not safe** for infant sleep. . . . **Three federal public health agencies [including CPSC]** and the [AAP] . . . have **issued warnings** recommending against the use of weighted infant blankets and wearables."

    b.   Trumka also wrote: "I am aware of **multiple infant deaths** involving weighted infant sleep sacks." *Id*. (emphasis in original).

    c.   Trumka included a statement he attributed to the AAP that "[t]hese products are associated with **concerning reductions in oxygen saturation levels** in infants," which he claimed "means there is **evidence that the use of weight[ed] sleep products on infants can lead to lower oxygen levels**, which if sustained, may be **harmful to the developing infant's brain**."

    d.   Trumka's statements **suggested a causal link between weighted infant sleep products such as Nested Bean's and SIDS**.

320.    These statements and implications were false or misleading, as Trumka knew or should have known when he made them, because: (1) the CPSC had not reached a consensus definition of what constitutes "weighted infant sleep products" and their characteristics based on hazard pattern; (2) the CPSC had not determined that weighted infant products including Nested Beans were "not safe" (indeed, Trumka's proposed rulemaking was rejected (for lack of sufficient data) by every other Commissioner who voted); (3) there was no "consensus" view led and agreed upon by the government entities—CPSC, NIH, and CDC simply relied on the AAP's unscientific and unsupported recommendation against weighted products; and (4) on information and belief, Trumka instrumental in directing the issuance of the warning from CPSC—it was not a Commission-wide directive or warning.

321.    Trumka also knew or recklessly disregarded that Nested Bean's own preliminary study in 2023 found that the oxygen saturation and pulse rate at a load of 30 grams (applied over the chest across an area of 10.6 square inches) were within allowable healthy ranges. He knew this because this data had been provided to CPSC staff and Commissioners multiple times between April and July 2023 and to Trumka himself in February 2024. In other words, Trumka knowingly or recklessly disregarded evidence—indisputably in CPSC's and his own possession—that Nested Bean's products did not cause "concerning reductions in oxygen saturation levels."

322.    Further, Trumka knew or should have known that no formal safety determination had been made by the CPSC or any other governmental authority about weighted infant sleep products like Nested Bean's—indeed no definition of "weighted" infant sleep products had been promulgated or agreed upon.

323.    Trumka also knew or should have known that there was no data or regulatory finding substantiating any claims of product danger and no data supporting the implication that Nested Bean's products specifically caused any infant death, and therefore did not pose an "unreasonable risk" of injury or death. But he connected Nested Bean's products to his false and/or misleading statements anyway.

324.    These false and/or misleading statements were made on CPSC's official website, official CPSC letterhead, or from Trumka's official CPSC social media accounts, and in the context of Trumka's role as a federal official, thereby falsely and misleadingly creating the appearance of government authority.

325.    When Trumka made these statements, he knew or should have known they were false and/or misleading, or acted with reckless disregard for their truth or falsity. In other words, Trumka acted with gross negligence or, at the very least, ordinary negligence.

326.    Trumka made these false and/or misleading statements knowing and intending that Nested Bean's retail partners would rely on the statements and stop selling Nested Bean's products.

327.    Trumka similarly made these false and/or misleading statements knowing and intending that Nested Bean's customers and potential customers would rely on the statements and stop buying and return already purchased Nested Bean products.

328.    Trumka's statements created the false and/or misleading impression of already completed or imminent regulatory action or investigation. Trumka's statements created the false and misleading appearance of an urgent and authoritative warning, even though none existed (particularly after Trumka's failed amendment was voted down 3-1).

329.    Given Trumka's position as a CPSC Commissioner and his use of CPSC's official website, CPSC letterhead, and official social media channels, retailers and consumers reasonably relied on Trumka's representations as authoritative statements about the safety of Nested Bean's weighted infant sleep products.

330.    As a result, Nested Bean's retail partners terminated their business relationships with Nested Bean, and Nested Bean's customers stopped purchases, returned purchased products, and customers and potential customers decided not to purchase Nested Bean's products.

331.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

332.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. § 551(13).

## COUNT 4
### Tortious Interference with Advantageous/Economic Relations

81

333.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

334.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

335.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

336.    Defendant, acting through Trumka and the CPSC, knowingly, intentionally, and willfully, engaged in conduct designed to interfere with Nested Bean's advantageous business relationships that Nested Bean had with retailers and consumers, and did so with improper motive or means.

337.    Trumka took a series of actions, including pushing for changes to CPSC's Safe Sleep guidance on its website and sending letters on official CPSC letterhead to major retailers—including but not limited to Target, Walmart, Nordstrom, and Babylist—intended through veiled threats (and misleadingly asserting authority that Trumka lacked) to pressure each of them to halt sales of Nested Bean's weighted infant sleep products. In addition, Trumka published public statements and videos in his official capacity. In all of these communications, Trumka misleadingly and falsely implied that the statements were being made on behalf of or with the imprimatur and authority of the CPSC. They were not.

338.    Trumka's unlawful actions were calculated to cause damage to Nested Bean's lawful business. The changes to CPSC's Safe Sleep guidance on its website, letters to retailers, and public statements contained false, misleading, and unsubstantiated claims about the purported safety of Nested Bean's products, despite the absence of any formal product safety

determination, recall, ban, or other regulatory action. Trumka's communications were directed specifically to certain of Nested Bean's retail partners. Trumka's statements were intended to and did influence those and other retailers' business decisions regarding Nested Bean's products and were intended to and did influence customers' decisions about whether to buy Nested Bean's products.

339.    Trumka's actions were taken with improper motive or means in that Trumka acted without right or justifiable cause and with the unlawful purpose of causing economic harm to Nested Bean. He aimed to harm Nested Bean by misleading retailers to terminate or suspend their commercial relationships with Nested Bean and remove their products from sale, and by misleading consumers into halting future purchases and returning already purchased products, based on the false belief (misleadingly conveyed by Trumka) that Nested Bean's products had been recalled, banned, or otherwise restricted by CPSC.

340.    Trumka intended to halt or at least disrupt sales of Nested Bean's products even though he had no legal right to do so, failed to comply with the legal requirements governing the CPSC and its Commissioners, and despite the fact that he was voted down 3-1 when he proposed regulating weighted infant sleep products including Nested Bean's.

341.    Trumka also acted in violation of the Consumer Product Safety Act's disclosure requirements, which mandate accuracy, fairness, and procedural safeguards including prior notice to the manufacturer and an opportunity to respond.

342.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational

harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

343.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. §551(13).

**COUNT 5**
**Tortious Interference with Contractual Relations**

344.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

345.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

346.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

347.    At all relevant times, Nested Bean had valid and enforceable contracts with multiple retail partners, including but not limited to, Target, Babylist, Amazon, and others, for the sale and distribution of Nested Bean's weighted infant sleep products. These contracts governed the business relationships between Nested Bean and its retail partners (including Target, Babylist, Amazon, and others), and were in full force and effect during the relevant time period.

348.    Similarly, Nested Bean had valid and enforceable contracts with its many customers, for the purchase and sale of Nested Bean's weighted infant sleep products. These

contracts governed the sales relationship between Nested Bean and its customers, and were in full force and effect during the relevant time period.

349.    Defendant, acting through Trumka and the CPSC, had actual knowledge of Nested Bean's contractual relationships with retailers and customers.

350.    Trumka, acting in his official capacity, intentionally and knowingly interfered with Nested Bean's contracts by inducing Nested Bean's retail partners and customers to breach their contracts, render performance impossible, or otherwise interfere with those contracts.

351.    Trumka took a series of actions, including pushing for changes to CPSC's Safe Sleep guidance on its website and sending letters on official CPSC letterhead to major retailers —including but not limited to Target, Walmart, Nordstrom, and Babylist—intended through veiled threats (and misleadingly asserting authority that Trumka lacked) to pressure each of them to halt sales of Nested Bean's weighted infant sleep products. In addition, Trumka published public statements and videos in his official capacity. In all of these communications, Trumka misleadingly and falsely implied that the statements were being made on behalf of or with the imprimatur and authority of the CPSC. They were not.

352.    Trumka's unlawful actions were calculated to cause damage to Nested Bean's contractual relationships with retailers and consumers. The changes to CPSC's Safe Sleep guidance on its website, letters to retailers, and public statements contained false, misleading, and unsubstantiated claims about the purported safety of Nested Bean's products, despite the absence of any formal product safety determination, recall, ban, or other regulatory action. Trumka's communications were directed specifically to certain of Nested Bean's retail partners with whom Nested Bean had contracts. Trumka's statements were intended to and did influence those and other retailers to stop selling Nested Bean's products in breach of their contracts or

85

otherwise undermining the performance of those contracts, and were intended to and did influence customers' decisions to halt purchases of, and/or return recently purchased, Nested Bean products.

353.    Trumka's actions were taken with improper motive or means in that Trumka acted without right or justifiable cause and with the unlawful purpose of causing economic harm to Nested Bean. He aimed to harm Nested Bean by misleading retailers to terminate or suspend their contracts with Nested Bean and remove their products from sale, and by misleading consumers into halting existing purchases and returning already purchased products, based on the false belief (misleadingly conveyed by Trumka) that Nested Bean's products had been recalled, banned, or otherwise restricted by CPSC.

354.    Trumka intended to halt or at least disrupt sales of Nested Bean's products even though he had no legal right to do so, failed to comply with the legal requirements governing the CPSC and its Commissioners, and despite the fact that he was voted down 3-1 when he proposed regulating weighted infant sleep products including Nested Bean's.

355.    Trumka also acted in violation of the Consumer Product Safety Act's disclosure requirements, which mandate accuracy, fairness, and procedural safeguards including prior notice to the manufacturer and an opportunity to respond.

356.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business

86

operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

357. The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. §551(13).

**COUNT 6**
**Commercial Disparagement / Injurious Falsehood**

358. Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

359. Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

360. As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

361. Defendant, through Trumka and the CPSC, published written and oral statements to third parties—including Nested Bean's retail partners and other retailers as well as Nested Bean's customers and potential customers—on CPSC's official website, on official CPSC letterhead, and via official CPSC social media accounts, asserting that Nested Bean's products were dangerous and posed a risk of death to infants.

362. For example, as alleged above, Trumka made the following false statements of fact:

   a. Trumka stated that weighted infant sleep products posed "**serious safety concerns**" and there was "a **consensus** among public health agencies [CPSC, NIH, and CDC], pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are **not safe** for infant sleep. . . . **Three federal public health agencies [including CPSC]** and the [AAP] . . . have

**issued warnings** recommending against the use of weighted infant blankets and wearables."

b. Trumka also wrote: "I am aware of **multiple infant deaths** involving weighted infant sleep sacks." *Id.* (emphasis in original).

c. Trumka included a statement he attributed to the AAP that "[t]hese products are associated with **concerning reductions in oxygen saturation levels** in infants," which he claimed "means there is **evidence that the use of weight[ed] sleep products on infants can lead to lower oxygen levels**, which if sustained, may be **harmful to the developing infant's brain**."

d. Trumka's statements **suggested a causal link between weighted infant sleep products such as Nested Bean's and SIDS**.

363. These statements and implications were false, as Trumka knew or recklessly disregarded when he made them, because: (1) the CPSC had not reached a consensus definition of what constitutes "weighted infant sleep products" and their characteristics based on hazard pattern; (2) the CPSC had not determined that weighted infant products including Nested Beans were "not safe" (indeed, Trumka's proposed rulemaking was rejected (for lack of sufficient data) by every other Commissioner who voted); (3) there was no "consensus" view led and agreed upon by the government entities—CPSC, NIH, and CDC simply relied on the AAP's unscientific and unsupported recommendation against weighted products; and (4) on information and belief, Trumka instrumental in directing the issuance of the warning from CPSC—it was not a Commission-wide directive or warning.

364. Trumka also knew or recklessly disregarded that Nested Bean's own preliminary study in 2023 found that the oxygen saturation and pulse rate at a load of 30 grams (applied over the chest across an area of 10.6 square inches) were within allowable healthy ranges. He knew this because this data had been provided to CPSC staff and Commissioners multiple times between April and July 2023 and to Trumka himself in February 2024. In other words, Trumka knowingly or recklessly disregarded evidence—indisputably in CPSC's and his own

88

possession—that Nested Bean's products did not cause "concerning reductions in oxygen saturation levels."

365.    Further, Trumka knew or recklessly disregarded that no formal safety determination had been made by the CPSC or any other governmental authority about weighted infant sleep products like Nested Bean's—indeed no definition of "weighted" infant sleep products had been promulgated or agreed upon.

366.    Trumka also knew or recklessly disregarded that there was no data or regulatory finding substantiating any claims of product danger and no data supporting the implication that Nested Bean's products specifically caused any infant deaths, and therefore did not pose an "unreasonable risk" of injury or death. But he connected Nested Bean's products to his false statements anyway.

367.    These false statements were made on CPSC's official website, on official CPSC letterhead, or from Trumka's official CPSC social media accounts, and in the context of Trumka's role as a federal official, thereby falsely and misleadingly creating the appearance of government authority.

368.    When Trumka made these statements, he knew they were false, or at the very least acted with reckless disregard for their truth or falsity.

369.    Trumka's statements were intended to create the false impression of already completed or imminent regulatory action or investigation. Trumka made the statements with the purpose of creating the false appearance of an urgent and authoritative warning, even though none existed (particularly after Trumka's failed amendment was voted down 3-1).

370.    Given Trumka's position as a CPSC Commissioner and his use of CPSC's official website, CPSC letterhead, and official social media channels, retailers and consumers reasonably

and foreseeably relied on Trumka's representations as authoritative statements about the safety of Nested Bean's weighted infant sleep products. That is exactly what Trumka intended.

371.    Trumka also acted in violation of the Consumer Product Safety Act's disclosure requirements, which mandate accuracy, fairness, and procedural safeguards including prior notice to the manufacturer and an opportunity to respond.

372.    Trumka's false statements about Nested Bean's products and business had a devastating impact on Nested Bean's business, as Trumka intended or at the very least should have foreseen.

373.    Nested Bean's retail partners terminated their business relationships with Nested Bean, and Nested Bean's customers stopped purchases, returned purchased products, and customers and potential customers decided not to purchase Nested Bean's products.

374.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

375.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. §551(13).

**COUNT 7**
**Defamation**

376.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

377.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

378.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

379.    Defendant, through Trumka and the CPSC, published written and oral statements to third parties—including Nested Bean's retail partners and other retailers as well as Nested Bean's customers and potential customers—on official CPSC letterhead and via official CPSC social media accounts, asserting that Nested Bean's products were dangerous and posed a risk of death to infants.

380.    For example, as alleged above, Trumka made the following false statements of fact:

a.  Trumka stated that weighted infant sleep products posed "**serious safety concerns**" and there was "a **consensus** among public health agencies [CPSC, NIH, and CDC], pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are **not safe** for infant sleep. . . . **Three federal public health agencies [including CPSC]** and the [AAP] . . . have **issued warnings** recommending against the use of weighted infant blankets and wearables."

b.  Trumka also wrote: "I am aware of **multiple infant deaths** involving weighted infant sleep sacks." *Id.* (emphasis in original).

c.  Trumka included a statement he attributed to the AAP that "[t]hese products are associated with **concerning reductions in oxygen saturation levels** in infants," which he claimed "means there is **evidence that the use of weight[ed] sleep products on infants can lead to lower oxygen levels**, which if sustained, may be **harmful to the developing infant's brain**."

d.  Trumka's statements **suggested a causal link between weighted infant sleep products such as Nested Bean's and SIDS**.

91

381.    These statements and implications were false, as Trumka knew or recklessly disregarded when he made them, because: (1) the CPSC had not reached a consensus definition of what constitutes "weighted infant sleep products" and their characteristics based on hazard pattern; (2) the CPSC had not determined that weighted infant products including Nested Beans were "not safe" (indeed, Trumka's proposed rulemaking was rejected (for lack of sufficient data) by every other Commissioner who voted); (3) there was no "consensus" view led and agreed upon by the government entities—CPSC, NIH, and CDC simply relied on the AAP's unscientific and unsupported recommendation against weighted products; and (4) on information and belief, Trumka instrumental in directing the issuance of the warning from CPSC—it was not a Commission-wide directive or warning.

382.    Trumka also knew or recklessly disregarded that Nested Bean's own preliminary study in 2023 found that the oxygen saturation and pulse rate at a load of 30 grams (applied over the chest across an area of 10.6 square inches) were within allowable healthy ranges. He knew this because this data had been provided to CPSC staff and Commissioners multiple times between April and July 2023 and to Trumka himself in February 2024. In other words, Trumka knowingly or recklessly disregarded evidence—indisputably in CPSC's and his own possession—that Nested Bean's products did not cause "concerning reductions in oxygen saturation levels."

383.    Further, Trumka knew or recklessly disregarded that no formal safety determination had been made by the CPSC or any other governmental authority about weighted infant sleep products like Nested Bean's—indeed no definition of "weighted" infant sleep products had been promulgated or agreed upon.

92

384. Trumka also knew or recklessly disregarded that there was no data or regulatory finding substantiating any claims of product danger and no data supporting the implication that Nested Bean's products specifically caused any infant deaths, and therefore did not pose an "unreasonable risk" of injury or death. But he connected Nested Bean's products to his false statements anyway.

385. These false statements were made on CPSC's official website, official CPSC letterhead, or from Trumka's official CPSC social media accounts, and in the context of Trumka's role as a federal official, thereby falsely and misleadingly creating the appearance of government authority.

386. When Trumka made these statements, he knew they were false, or at the very least acted with reckless disregard for their truth or falsity.

387. Trumka's statements were intended to create the false impression of already completed or imminent regulatory action or investigation. Trumka made the statements with the purpose of creating the false appearance of an urgent and authoritative warning, even though none existed (particularly after Trumka's failed amendment was voted down 3-1).

388. Given Trumka's position as a CPSC Commissioner and his use of CPSC's official website, CPSC letterhead, and official social media channels, retailers and consumers reasonably relied on Trumka's representations as authoritative statements about the safety of Nested Bean's weighted infant sleep products.

389. Trumka also acted in violation of the Consumer Product Safety Act's disclosure requirements, which mandate accuracy, fairness, and procedural safeguards including prior notice to the manufacturer and an opportunity to respond.

390.    Trumka's false statements had a devastating impact on Nested Bean's reputation and its business.

391.    Nested Bean's retail partners terminated their business relationships with Nested Bean, and Nested Bean's customers stopped purchases, returned purchased products, and customers and potential customers decided not to purchase Nested Bean's products.

392.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

393.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. §551(13).

## COUNT 8
### False Light[70]

394.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

395.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

---

[70] Nested Bean includes this count in the event the Court concludes that Maryland law governs this case.

396.     As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

397.     Defendant, through Trumka and the CPSC, gave publicity to matters concerning Nested Bean by publishing the statements alleged above on CPSC's official website, on CPSC letterhead, and via CPSC social media accounts through public channels that reached a broad and public audience, including retailers, consumers, journalists who amplified the statements, and others.

398.     As alleged throughout the Complaint, Trumka's conduct put Nested Bean before the public in a false light, including without limitation, by calling its products a "serious threat[]" to the lives of babies" and associating Nested Bean's products with "multiple infant deaths," among other false statements alleged above.

399.     The false light in which Nested Bean was placed would be highly offensive to a reasonable person, as the communications implied that Nested Bean knowingly sold dangerous products and was indifferent to the safety of infants.

400.     Trumka made the statements at issue intending them to cause alarm among the public, Nested Bean's current and potential retail partners, and Nested Bean's current and potential customers.

401.     Trumka also intended to give the false and misleading impression of already completed or imminent regulatory action or investigation. Trumka made the statements with the purpose of creating the false appearance of an urgent and authoritative warning, even though none existed (particularly after Trumka's failed amendment was voted down 3-1).

402.    As alleged above, Trumka acted with knowledge or with reckless disregard for the falsity of the publicized statements and the false light in which Trumka placed Nested Bean.

403.    Trumka did all this without a sufficient factual basis and without complying with the procedural and substantive guardrails under the Consumer Product Safety Act and its regulations.

404.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

405.    The actions alleged in the Complaint did not constitute agency action under 5 U.S.C. §551(13).

**COUNT 9**
**Negligence**

406.    Nested Bean incorporates by reference all the preceding allegations as though fully set forth herein.

407.    Under the FTCA, the United States is liable in tort where a private party would be liable under applicable state law.

408.    As alleged above, Defendant acting through Trumka and the CPSC, engaged in an unlawful crusade against Nested Bean's weighted infant sleep products beginning in 2022 and extending well into 2024.

409.    Defendant, acting through Trumka and the CPSC, owed Nested Bean a duty of care, including without limitation, a duty arising from their obligations under the Consumer Product Safety Act, its implementing regulations, and CPSC Order No. 1450.2.

410.    These provisions establish a duty and specific standards of care and conduct requiring that any public statements about the safety of a consumer product—particularly those that identify or implicate a manufacturer—must be accurate, not misleading, and made in accordance with mandatory procedural safeguards, including prior notice to the manufacturer and an opportunity to respond.

411.    The Consumer Product Safety Act, its regulations, and CPSC Order No. 1450.2 were enacted and promulgated to protect a class of persons that includes manufacturers like Nested Bean. These statutory and regulatory duties are specifically intended to protect manufacturers from reputational, economic, and other business harm resulting from inaccurate or misleading public statements about their products.

412.    Defendant, acting through Trumka and the CPSC, negligently made false and/or misleading statements about the safety of Nested Bean's products, including without limitation in public statements and letters to retailers, and in the changes to CPSC's Safe Sleep guidance on its website, without sufficient factual basis, supporting date, or compliance with the procedural and substantive safeguards mandated by the Consumer Product Safety Act, its implementing regulations, and CPSC Order No. 1450.2.

413.    Defendant breached the applicable standard of care, including through violation of these statutory and regulatory obligations.

414.    Defendant's negligent conduct was the direct and proximate cause of Nested Bean's injuries.

415.    Nested Bean suffered damages as a result, including without limitation, the loss of sales and revenue due to retailers stopping sales of Nested Bean's products and consumers stopping purchases of Nested Bean's products; the loss of business opportunities and existing and prospective contractual relationships with retailers and consumers; significant reputational harm and diminished goodwill in the market; consequential economic losses including unsold inventory storage and disposal, costs related to returns, employee layoffs, and reduced business operations; and ongoing and future economic harm (including diminished enterprise value) stemming from the damage to Nested Bean's market position and disruption of its business relationships.

416.    Because Nested Bean alleges that Defendant (1) violated Nested Bean's due process rights, and (2) failed to follow (or failed to exercise due care in following) a federal statute, regulation, or policy that specifically prescribed a course of action for Defendant to follow, the defenses in 28 U.S.C. § 2680(a) are not available to the Defendant.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Nested Bean, Inc. respectfully requests judgment in its favor and against Defendant the United States of America, and hereby seeks the following relief:

A.  Damages in an amount to be determined at trial in an amount no less than the amount demanded in Plaintiff's administrative claim;

B.  Post-judgment interest as allowed by law;

C.  An award for all reasonable fees and costs incurred herein and that Plaintiff may

be entitled to under law, including under the Equal Access to Justice Act, 28

U.S.C. § 2412(b); and

D.  Such other relief as this Court deems just and proper.

Respectfully submitted,

NESTED BEAN, INC.

By its attorneys,

*/s/ Joseph M. Cacace*
Joseph M. Cacace (BBO # 672298)
John J. Geary, Jr. (BBO # 709193)
TODD & WELD LLP
One Federal Street
Boston, MA 02110
617-720-2626
jcacace@toddweld.com
jgeary@toddweld.com

Dated:  May 7, 2026